**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

FEB 2 2 2023

TAMMY H. DOWNS, CLERK
By: _____
DEP CLERK

## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## CENTRAL DIVISION

AARON PARISH BLACK, AS                )
TRUSTEE OF THE REBA J. PARISH         )
TRUST, NORMA J. BRYANT, AND DAN       )
LARRY PENNINGTON, individually and on )
behalf of a class of similarly situated individuals, )
                                      )
                                      )
PLAINTIFFS,                           )
                                      )
v.                                    )       Case No. 4:23-cv-140-KGB
                                      )
                                      )
RIVERBEND OIL & GAS VIII, L.L.C.      )
                                      )       This case assigned to District Judge Baker
                                      )       and to Magistrate Judge Kearney
DEFENDANT.                            )

### CLASS ACTION COMPLAINT

Plaintiffs Aaron Parish Black ("Black"), as Trustee of the Reba J. Parish Trust ("Parish Trust"), Norma J. Bryant ("Bryant"), and Larry Pennington ("Pennington") (collectively, "Plaintiffs"), individually and on behalf of a class of similarly situated individuals, for their class action complaint against Defendants Riverbend Oil & Gas VIII, L.L.C. ("Riverbend") and John Doe (collectively, "Defendants") allege:

### PARTIES

1.      Plaintiff Pennington is a resident and citizen of the State of Arkansas, and has been paid royalties by Flywheel Energy Production, LLC ("Flywheel") on behalf of the Defendants under royalty agreements in which the Defendants have owned the lessee's interests.

2.      Plaintiff Bryant is a resident and citizen of the State of Arkansas and has been paid royalties by Flywheel on behalf of the Defendants under a royalty agreement in which the Defendants have owned the lessee's interests.

3.      Plaintiff Black, as Trustee of the Parish Trust, is a resident and citizen of the State of Arkansas. The Parish Trust has been paid royalties by Flywheel on behalf of the Defendants under a royalty agreement in which the Defendants have owned the lessee's interests.

4.      Defendant Riverbend is a Texas Limited Liability Company with a principal address in Houston, Texas. Riverbend owned certain natural gas assets in the Fayetteville Shale and may be served with process in this Action through its registered agent: The Corporation Trust Company, 124 West Capitol Avenue, Suite 1900, Little Rock, AR 72201-3717.

5.      Defendant John Doe is an unknown purchaser of Riverbend's equity interests including a substantial asset base of Non-Operated Wells. Effective May 1, 2022, Riverbend sold its Fayetteville Shale assets to an unknown purchaser, the identity of which was not publicly available or disclosed. (Ex. 1).

## JURISDICTION AND VENUE

6.      Pursuant to 28 U.S.C. § 1332(d)(10), Defendant Riverbend is deemed to be a citizen of Texas in this class action, for purposes of the Class Action Fairness Act.

7.      This Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because: (a) Plaintiffs have brought this case as a class action under Fed. R. Civ. P. 23(b)(3); (b) each Subclass exceeds 100 members; (c) each Subclass contains at least one Subclass member who is a citizen of a state different from the State of Texas, where Defendants are deemed to be citizens under 28 U.S.C. § 1332(d); and (d) the amount in controversy for the claims of each Subclass exceeds the sum of $5,000,000, exclusive of interest and costs.

8.      This Court has personal jurisdiction over Riverbend and John Doe because such Defendants have conducted substantial business activities in the State of Arkansas, and because the acts and conduct of such Defendants giving rise to the claims asserted in this class action complaint occurred in the State of Arkansas. Such Defendants have transacted business in Arkansas, held property in Arkansas, and paid royalties to persons residing in Arkansas, and therefore personal jurisdiction is proper under Arkansas' long-arm statute, A.C.A. § 16-4-401, and the Due Process Clause of the United States Constitution. U.S. CONST. AMEND. 14.

9.      Pursuant to 28 U.S.C. § 1391, venue is proper in this Court because a substantial part of the acts and conduct giving rise to the claims asserted in this class action complaint occurred in this judicial district.

## CLASS DEFINITION

10.      Plaintiffs bring this action individually and on behalf of three Subclasses, defined as:

## SUBCLASS I

Plaintiff Pennington brings this action on behalf of himself, and the Subclass ("Subclass I") defined as follows:

> All persons and entities to whom Flywheel, or any affiliates of Flywheel (collectively, "Flywheel"), paid royalties on behalf of any of the Defendants at any time since July 1, 2021, under oil and gas royalty agreements ("Subclass I Royalty Agreements") covering lands located in the State of Arkansas, under which any of the Defendants own, or have owned, the working interests, and are therefore legally responsible for the payment of royalties under the Subclass I Royalty Agreements, and which Subclass I Royalty Agreements require royalties to be paid based upon a specified percentage of the "gross proceeds,…but in no event more than [the specified percentage] of the actual amount received by the Lessee" or "proceeds, ... but in no event more or less than the actual amount received by Lessee" ("actual amount received royalty provisions"). An example of a Subclass I Royalty Agreement containing the actual amounts received proceeds royalty provision attached hereto as Exhibits 2 and 3.

Subclass I excludes: (a) the United States; (b) the Defendants and their respective affiliates, employees, officers, and directors; and (c) persons who have been a working interest owner in a well subject to a Subclass I Royalty Agreements at any time since July 1, 2021.

## SUBCLASS II

Plaintiff Bryant brings this action on behalf of herself, and the Subclass ("Subclass II") defined as

follows:

All persons and entities to whom Flywheel or any of Flywheel's affiliated entities paid royalties on behalf of any of the Defendants at any time since July 1, 2021, under oil and gas lease agreements or overriding royalty agreements ("Subclass II Royalty Agreements") covering lands located in the State of Arkansas, under which any of the Defendants own, or have owned, the working interests, and are therefore legally responsible for the payment of royalties under the Subclass II Royalty Agreements, and which agreements require royalties to be paid based upon [a specified percentage] "of the gross proceeds" without deduct[ion] [of] any costs or expenses from such gross proceeds ("gross proceeds royalty provision"). An example of a Subclass II Royalty Agreement containing the gross proceeds royalty provision is attached hereto as Exhibit 4.

Subclass II excludes: (a) the United States; (b) the Defendants and their respective affiliates, employees, officers, and directors; and (c) persons who have been a working interest owner in a well subject to a Subclass II Royalty Agreement at any time since July 1, 2021.

## SUBCLASS III

Plaintiff Black, as Trustee of the Parish Trust, brings this action on behalf of himself and the

Subclass ("Subclass III") defined as follows:

All persons and entities to whom Flywheel paid royalties on behalf of any of the Defendants at any time since July 1, 2021, under oil and gas lease agreements or overriding royalty agreements ("Subclass III Royalty Agreements") covering lands located in the State of Arkansas, under which any of the Defendants own, or have owned, the working interests, and are therefore legally responsible for the payment of royalties under such Subclass III Royalty Agreements, and which agreements require royalties to be paid based on an amount which specifically prohibits the deduction of post-production costs in the calculation of the lessor's royalty or the overriding royalty payee's royalties. An example of a Subclass III Royalty Agreement is attached hereto as Exhibit 5.

Subclass III excludes: (a) the United States; (b) the Defendants and their respective affiliates, employees, officers, and directors; and (c) persons who have been working interest owners in a well subject to a Subclass III Royalty Agreement at any time since July 1, 2021.

## SUBCLASS I FACTUAL ALLEGATIONS

11.     From July 1, 2021, through the present, Plaintiff Pennington and the Subclass I members received royalties from Flywheel, on behalf of one or more of the Defendants, based on the production of natural gas from wells subject to the Subclass I Royalty Agreements. With the consent of Defendants, Flywheel operates wells ("Non-Op Wells") which are subject to the Subclass I Royalty Agreements, in which the Defendant owns all or a portion of the lessee's interests and has paid royalties to the Subclass I members on behalf of the Defendant with respect to the natural gas produced and sold from the Non-Op Wells.

12.     Because the Defendants retained the lessee's interest under the Subclass I Royalty Agreements, the Defendants are legally responsible to the Subclass I members for the full amount of royalties due and owing under the Subclass I Royalty Agreements, including the royalty underpayments which are the subject of this class action.

13.     On June 9, 2008, Dan and Frieda Pennington, husband and wife, as Lessors, entered into two oil and gas royalty agreements with Chesapeake Exploration, L.L.C. ("Chesapeake"), as Lessee ("Pennington Royalty Agreements"). A modification attachment to the Pennington Royalty Agreements modified the original royalty clause. The two Pennington Royalty Agreements, including the attached modifications, are attached as Exhibit 2 and 3.

14.     The modification of both Pennington Royalty Agreements has an identical "actual amount received" royalty provision, which provides, in pertinent part, that the Lessee shall:

> pay Lessor for gas of whatsoever nature or kind (with all of its constituents), including but not limited to casinghead gas, coal seam gas, coal bed

5

methane, and all other gaseous or vaporous substances, produced and sold and used off the lease premises or used in the manufacture of therefrom, 1/5 <u>of the gross proceeds</u> for the gas sold, used off the premises, or in the manufacture of the products therefrom, <u>but in no event more than 1/5 of the actual amount received</u> by the Lessee, said payments to be made monthly.

(Exhibit 2, p. 11; Exhibit 3, p. 9) (emphasis added).

15.     In addition to Pennington, numerous other members of Subclass I are lessors under Subclass I Royalty Agreements that contain an actual amount received royalty provision.

16.     Effective July 1, 2021, Riverbend acquired the lessee's interest in the two Pennington Royalty Agreements and the other Subclass I Royalty Agreements.

17.     Effective May 1, 2022, the John Doe Defendant acquired the lessee's interest in the two Pennington Royalty Agreements from Riverbend. On information and belief, the John Doe Defendant also acquired the lessee's interest in each of the other Subclass I Royalty Agreements.

18.     Since July 1, 2021, Flywheel has had an agreement with DeSoto Gathering Company, LLC ("DeSoto"), in which DeSoto charged Flywheel certain gathering, treating, and compression fees in exchange for providing gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing services ("midstream services") for the natural gas produced from the Plaintiff's and Subclass I members' Non-Op Wells. Flywheel then deducted these fees from the Plaintiff's and Subclass I members' royalty payments.

19.     DeSoto and Flywheel are affiliated companies which are both wholly owned subsidiaries of Flywheel Energy, LLC.

20.     After the midstream services are provided by DeSoto to transform the raw natural gas into a marketable form, all of the natural gas produced from the Plaintiff's and Subclass I members' wells is transferred to a different Flywheel marketing affiliated entity, which then sells all the natural gas to third parties at a location downstream from the inlet of the interstate pipeline.

6

Flywheel's marketing affiliated entity remits the proceeds to Flywheel based on a weighted average sales price (WASP) of the natural gas.

21.     All royalties paid by Flywheel to Plaintiff and the Subclass I members on behalf of the Defendants are calculated by using the WASP, and then deducting from the WASP the fees charged by DeSoto for the midstream services required to transform the raw gas into a marketable product which is sold to non-affiliated third-party purchasers.

22.     In the calculation and payment of royalties to the Plaintiff and the Subclass I members under the Subclass I Royalty Agreements, Flywheel does not pay royalties on behalf of the Defendants based upon the gross proceeds actually received on the sale of natural gas to third party purchasers as required by the Subclass I Royalty Agreements. Instead, Flywheel improperly deducts various post-production costs from the sales price of the natural gas in its calculation and payment of royalties to Plaintiff Pennington and the Subclass I members.

23.     Because Flywheel calculates and pays royalties to Plaintiff Pennington and the Subclass I members under the Subclass I Royalty Agreements in the manner referenced above, Defendants have breached their contractual obligations to Plaintiff Pennington and Subclass I under the Subclass I Royalty Agreements.

24.     As a direct result of the Defendants' breaches of the Subclass I Royalty Agreements as described above, Plaintiff Pennington and the members of the Subclass I have sustained substantial damages.

## SUBCLASS I CLASS ALLEGATIONS

25.     The claims of Plaintiff Pennington and the Subclass I members against Defendants satisfy each of the requirements for certification of a Fed. R. Civ. P. 23(b)(3) Class, as set forth below.

7

**NUMEROSITY – Federal Rule of Civil Procedure 23(a)(1)**

26.      The membership of Subclass I is so numerous that joinder of all Subclass I members

is impracticable. On information and belief, there are more than five hundred Subclass I members.

**COMMONALITY – Federal Rule of Civil Procedure 23(a)(2)**

27.      There are questions of law or fact common to the claims of the Subclass I members,

including:

      A.  The extent of the Defendants' royalty payment obligations to Plaintiff Pennington
          and Subclass I under the Subclass I Royalty Agreements;

      B.  Whether the Defendants deducted various post-production costs in the calculation
          of the Subclass I members' royalty payments;

      C.  Whether the Defendants have breached their royalty payment obligations to
          Plaintiff Pennington and Subclass I under the Subclass I Royalty Agreements by
          deducting various post-production costs in the calculation and payment of the
          Subclass I members' royalty payments;

      D.  Whether the Defendants should be required to pay prejudgment interest on the
          Subclass I members' royalty underpayments at the prejudgment interest rate of
          twelve percent per annum, pursuant to A.C.A. § 15-774-601(e).

**TYPICALITY – Federal Rule of Civil Procedure 23(a)(3)**

28.      Plaintiff Pennington's claims are typical of the claims of the Subclass I members.

**ADEQUACY OF REPRESENTATION – Federal Rule of Civil Procedure 23(a)(4)**

29.      Plaintiff Pennington will fairly and adequately protect the interests of Subclass I,

and he has retained counsel who are experienced in prosecuting class action royalty underpayment

lawsuits against natural gas producers.

**PREDOMINANCE AND SUPERIORITY – Federal Rule of Civil Procedure 23(b)(3)**

30.      The questions of law or fact common to the members of Subclass I predominate

over any individual questions which may exist.

31.    A class action is superior to other available methods for the fair and efficient adjudication of the Subclass I members' claims against the Defendants.

## COUNT I – BREACH OF CONTRACT
### (Against Defendants on Behalf of Subclass I)

32.    The allegations contained in Paragraphs 1 through 31, inclusive, are restated and incorporated by reference herein.

33.    Defendants have breached their royalty payment obligations to Plaintiff Pennington and Subclass I under the Subclass I Royalty Agreements, by failing to pay royalties based upon the gross proceeds actually received on the sale of natural gas to third party purchasers at the pipeline interconnects, without deductions.

34.    As a direct result of the failure to pay royalties to Subclass I members based on the proceeds actually received on the sale of natural gas, without deductions, Defendants have substantially underpaid the royalties owed to Plaintiff Pennington and Subclass I, and as a result, Plaintiff Pennington and the Subclass I members have sustained substantial damages.

## COUNT II – VIOLATION OF A.C.A. § 15-74-601(e)
### (Against Defendants on Behalf of Subclass I)

35.    Plaintiff incorporates by reference Paragraphs 1 through 34 of this class action complaint.

36.    Because the Defendants are responsible for the royalty payments to Plaintiff Pennington and the Subclass I members, which are substantially underpaid, Defendants are required to pay prejudgment interest on each royalty underpayment at a rate of twelve percent per annum simple interest, from the date of each royalty underpayment through the date of final judgement, pursuant to A.C.A. § 15-774-601(e).

## COUNT III – DECLARATORY JUDGMENT
### (Against John Doe Defendant on Behalf of Subclass I)

37.    Plaintiff Pennington incorporates by reference Paragraphs 1 through 36 of this class action complaint.

38.    A controversy exists between Subclass I and the John Doe Defendant regarding the correct method of such Defendant's calculation and payment of royalties to Plaintiff and the Subclass I members after the date of final judgment in this case ("future royalties").

39.    Plaintiff Pennington and Subclass I requests that the Court enter a declaratory judgment declaring that the John Doe Defendant is required to pay future royalties to Plaintiff Pennington and Subclass I under the Subclass I Royalty Agreements at issue, based upon the gross proceeds actually received on the sale of natural gas to third parties, without the deduction of post-production costs.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff Pennington prays for the following relief:

A.    An Order that the claims asserted herein by Plaintiff Pennington, on behalf of the defined Subclass I, be certified as a class action pursuant to Fed. R. Civ. P. 23(b)(3), that Plaintiff Pennington be appointed as the Subclass I Class Representative, and that attorneys George Barton and Stacy Burrows be appointed as Class Counsel for Subclass I;

B.    A judgment in favor of Plaintiff and the Subclass I members on their claim for Defendants' breach of the Subclass I Royalty Agreements at issue, in an amount which equals the full amount of Defendants' royalty underpayments since July 1, 2021, through the date of final judgement, plus applicable prejudgment interest;

C.      A judgment determining that Plaintiff Pennington and the members of Subclass I are entitled to recover prejudgment interest at the statutory interest rate of twelve percent per annum, pursuant to A.C.A. § 15-74-601(e);

E.      An award of court costs; and

F.      Such other relief as the Court deems just.

## SUBCLASS II FACTUAL ALLEGATIONS

40.     From July 1, 2021, through the present, Plaintiff Bryant and the Subclass II members have received royalties from Flywheel on behalf of Defendants, based on the production of natural gas from wells subject to the Subclass II Royalty Agreements. With the consent of Defendants, Flywheel operates wells ("Non-Op Wells") which are subject to the Subclass II Royalty Agreements in which the Defendants own all or a portion of the lessee's interest, and Flywheel paid royalties to Plaintiff Bryant and the Subclass II members with respect to the natural gas produced and sold from the Non-Op Wells.

41.     Because the Defendants retained the lessee's interests under the Subclass II Royalty Agreements, the Defendants are legally responsible to the Subclass II members for the full amount of royalties owed under the Subclass II Royalty Agreements, including the royalty underpayments which are the subject of this class action.

42.     On March 30, 2010, Richard and Norma Bryant, husband and wife, as Lessors, entered into an oil and gas royalty agreement with Chesapeake, as lessee ("Bryant Royalty Agreement"). The Bryant Royalty Agreement is attached as Exhibit 4.

43.     The Bryant Royalty Agreement contains a "gross proceeds" royalty provision, which provides, in pertinent part, that the Lessee shall:

> pay Lessor for gas and oil of whatsoever nature or kind (with all of its constituents), including but not limited to casinghead gas, coal seam gas, coal bed methane, oil,

11

and all other gaseous or vaporous substances, and all pooling and commingling production, products sold or used off the premises or used in the manufacture of products therefrom, twenty percent (20%) of the gross proceeds, with no production or transportation fees deducted, for the gas and oil sold, used off the [sic] premises in the manufacture of products therefrom, said payments to be made monthly...

Lessee shall not deduct any costs or expenses from such gross proceeds except Lessor's pro rata share of any severance taxes that may become payable out of the Lessor's share of gross production; ...

(Exhibit 4, p. 2) (emphasis added)

44.     In addition to Bryant, numerous other members of Subclass II have Subclass II Royalty Agreements that contain a gross proceeds royalty provision.

45.     Effective July 1, 2021, Riverbend acquired the lessee's interest in the Bryant Royalty Agreement and the other Subclass II Royalty Agreement.

46.     Effective May 1, 2022, the John Doe Defendant acquired the lessee's interest in the Bryant Royalty Agreement from Riverbend. On information and belief, the John Doe Defendant also acquired the lessee's interest in each of the other Subclass II Royalty Agreement.

47.     Since July 1, 2021, Flywheel has had an agreement with DeSoto, in which DeSoto charges Flywheel for certain midstream services for the natural gas produced from the Plaintiff and Subclass II members' Non-Op Wells. Flywheel then deducts these fees from the Plaintiff's and Subclass II members' royalty payments.

48.     DeSoto and Flywheel are affiliated companies which are both wholly owned subsidiaries of Flywheel Energy, LLC.

49.     After the midstream services are provided by DeSoto to transform the raw natural gas into a marketable form, all of the natural gas produced from the Plaintiff and Subclass II members' wells has been transferred to a different Flywheel affiliated entity, which then sells all the natural gas to third parties at a location downstream from the inlet of the interstate pipeline.

12

Flywheel's affiliated entity remits the proceeds to Flywheel based on a weighted average sales price (WASP) of the natural gas.

50.    All royalties paid by Flywheel to Plaintiff and the Subclass II members on behalf of the Defendants are calculated by using the WASP, and then deducting from the WASP the fees charged by DeSoto for the midstream services required to transform the raw gas into a marketable product which is sold to non-affiliated third-party purchasers.

51.    In the calculation and payment of royalties to the Plaintiff and the Subclass II members under the Subclass II Royalty Agreements, Flywheel does not pay royalties on behalf of the Defendants based upon the gross proceeds actually received on the sale of natural gas to third party purchasers as required by the Subclass II Royalty Agreements. Instead, Flywheel improperly deducts various post-production costs from the sales price of the natural gas in its calculation and payment of royalties to Plaintiff Bryant and the Subclass II members.

52.    Because Flywheel calculates and pays royalties to Plaintiff Bryant and Subclass II members under the Subclass II Royalty Agreements in the manner referenced above, Defendants have breached their contractual obligations to Plaintiff Bryant and Subclass II under the Subclass II Royalty Agreements.

53.    As a direct result of the Defendants' breaches of the Subclass II Royalty Agreements as described above, Plaintiff Bryant and the members of the Subclass II have sustained substantial damages.

## SUBCLASS II CLASS ALLEGATIONS

54.    The claims of Plaintiff Bryant and the Subclass II members against Defendants satisfy each requirement for the certification of a Fed. R. Civ. P. 23(b)(3) Class, as set forth below.

**NUMEROSITY – Federal Rule of Civil Procedure 23(a)(1)**

55.     The proposed Subclass II is so numerous that joinder of all Subclass II members is impracticable. On information and belief, there are more than five hundred members of Subclass II.

**COMMONALITY – Federal Rule of Civil Procedure 23(a)(2)**

56.     There are questions of law or fact common to the claims of the Subclass II members, including:

A.  The extent of the Defendants' royalty payment obligations to Plaintiff Bryant and Subclass II under the Subclass II Royalty Agreements;

B.  Whether the Defendants have breached their royalty payment obligations to Plaintiff Bryant and Subclass II under the Subclass II Royalty Agreements;

C.  Whether the Defendants breached their contractual obligations under the Subclass II Royalty Agreements by deducting various post-production costs in the calculation of the Subclass II members' royalty payments;

D.  Whether the Defendants should be required to pay prejudgment interest on all of the Subclass II members' royalty underpayments at the prejudgment interest rate of twelve percent per annum, pursuant to A.C.A. §§ 15-774-601(e).

**TYPICALITY – Federal Rule of Civil Procedure 23(a)(3)**

57.     Plaintiff Bryant's claims are typical of the claims of the members of Subclass II.

**ADEQUACY OF REPRESENTATION – Federal Rule of Civil Procedure 23(a)(4)**

58.     Plaintiff Bryant will fairly and adequately protect the interests of the Subclass II, and she retained counsel who are experienced in prosecuting class action royalty underpayment lawsuits against natural gas producers.

**PREDOMINANCE AND SUPERIORITY – Federal Rule of Civil Procedure 23(b)(3)**

59.     The questions of law or fact common to the members of Subclass II predominate over any individual questions which may exist.

60.     A class action is superior to other available methods for the fair and efficient adjudication of the Subclass II members' claims against the Defendants.

## COUNT IV – BREACH OF CONTRACT
### (Against Defendants on Behalf of Subclass II)

61.     The allegations contained in Paragraphs 1 through 60 inclusive, are restated and incorporated by reference herein.

62.     Defendants have breached their royalty payment obligations to Plaintiff Bryant and Subclass II under the Subclass II Royalty Agreements, by failing to pay royalties based upon the gross proceeds actually received on the sale of natural gas to third party purchasers at the pipeline interconnects, without deductions.

63.     As a direct result of the failure to pay royalties to Subclass II members based on the proceeds received on the sale of natural gas without deductions, Defendants have substantially underpaid the royalties owed to Plaintiff Bryant and Subclass II.

## COUNT V – VIOLATION OF A.C.A. § 15-74-601(e)
### (Against Defendants on Behalf of Subclass II)

64.     Plaintiff incorporates by reference Paragraphs 1 through 63 of this class action complaint.

65.     Because the Defendants are responsible for the royalty payments to Plaintiff Bryant and the Subclass II members, which were substantially underpaid, Defendants are required to pay prejudgment interest on each royalty underpayment at a rate of twelve percent per annum simple interest, from the date of each royalty underpayment through the date of final judgement, pursuant to A.C.A. § 15-774-601(e).

## COUNT VI – DECLARATORY JUDGMENT
### (Against John Doe Defendant on Behalf of Subclass II)

66.    Plaintiff incorporates by reference Paragraphs 1 through 65 of this class action complaint.

67.    A controversy exists between Subclass II and the John Doe Defendant regarding the correct method of such Defendant's calculation and payment of royalties to Plaintiff and the Subclass II Royalty Agreements after the date of final judgment in this case ("future royalties").

68.    Plaintiff Bryant and Subclass II requests that the Court enter a declaratory judgment declaring that the John Doe Defendant is required to pay future royalties to Plaintiff Bryant and Subclass II under the Subclass II Royalty Agreements at issue, based upon the gross proceeds received on the sale of natural gas to third parties, without the deduction of post-production costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Bryant prays for the following relief:

A.    An Order that the claims asserted herein by Plaintiff Bryant, on behalf of the defined Subclass II, be certified as a class action pursuant to Fed. R. Civ. P. 23(b)(3), that Plaintiff Bryant be appointed as the Subclass II Class Representative, and that attorneys George Barton and Stacy Burrows be appointed as Class Counsel for Subclass II.

B.    A judgment in favor of Plaintiff and the Subclass II members on their claim for Defendants' breach of the Subclass II Royalty Agreements at issue, in an amount which equals the full amount of Defendants' royalty underpayments since July 1, 2021 through the date of final judgement, plus applicable prejudgment interest;

C.    A judgment determining the Plaintiff Bryant and the members of Subclass II are entitled to recover prejudgment interest at the statutory interest rate of twelve percent per annum, pursuant to A.C.A. § 15-74-601(e);

E.    An award of court costs; and

F.      Such other relief as the Court deems just.

## SUBCLASS III FACTUAL ALLEGATIONS

69.     From July 1, 2021, through the present, Plaintiff Black and the Subclass III members have received royalties from Flywheel, on behalf of one or more of the Defendants, based on the production of natural gas from wells subject to the Subclass III Royalty Agreements. With the consent of Defendants, Flywheel operates Non-Op Wells which are subject to the Subclass III Royalty Agreements, in which the Defendants own all or a portion of the lessee's interests, and paid royalties to the Subclass III members on behalf of the Defendants with respect to the natural gas produced and sold from the Non-Op Wells.

70.     Because the Defendants retained the lessee's interests under the Subclass III Royalty Agreements, the Defendants are legally responsible to the Subclass III members for the full amount of royalties due and owing under the Subclass III Royalty Agreements, including the royalty underpayments which are the subject of this class action.

71.     On August 13, 2007, Ralph and Reba Parish, as lessors, entered into an oil and gas royalty agreement with Chesapeake, as lessee ("Parish Trust Royalty Agreement"), conveying the leased premises located in the State of Arkansas. The lessor's interest in the Parish Trust Royalty Agreement was subsequently transferred to the Parish Trust. The Parish Trust Royalty Agreement is attached as Exhibit 5.

72.     The Parish Trust Royalty Agreement contains the following natural gas royalty provision, which provides that the lessee shall:

> pay, or if required by law, contribute to be paid to Lessor a royalty of $3/16^{th}$ of the proceeds realized by lessee from the sale of all gas, including all substances contained in such gas, but in no event more or less than the actual amount received by lessee, less applicable taxes, said payments to be made monthly. If such gas is used by lessee off the leased premises or used for

the manufacture of casing head gasoline or other products, Lessee shall pay Lessor 3/16th of the market value at the well for gas so used.

(Exhibit 5, p. 2)

73.    Additionally, the Parish Trust Royalty Agreement contains the following provision,

attached to Exhibit 5 as Exhibit A, which is commonly referred to as a "Marketing Enhancement

Clause":

> Lessor's royalty <u>shall never bear or be charged with, directly or indirectly, any part of the costs or expenses of production, gathering, dehydration, compression, transportation, manufacturing, processing, treating, or marketing of oil and/or gas produced from the leased premises.</u> There shall be no deductions from Lessor's royalty for costs and expenses associated with the construction, operation, or depreciation of any pipeline, gathering system, plant or other facility or equipment for processing, and/or treating oil and/or gas or their constituents produced from the leased premises. However, any such costs which result in enhancing the value of the marketable oil, gas or other products to receive a better price may be deducted from Lessor's share of production so long as they are based on Lessee's actual cost of such enhancements. However, in no event shall Lessor receive a price that is less than, or more than, the price received by the Lessee.

(Exhibit 5, p. 6) (emphasis added)

74.    Attached as Exhibit 6 is an example of another royalty agreement which contains

the following Prohibits Deduction Clause:

> It is agreed between the Lessor and the Lessee that, notwithstanding any language herein to the contrary, all oil, gas, or other proceeds accruing to the Lessor under this lease or by state law shall be without deduction for the cost of producing, whether directly or indirectly, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing, the oil, gas, and other products produced hereunder to transform the product into a marketable form; however, any such cost which result in enhancing the value of the marketable oil, gas, or other products to receive a better price may be deducted from Lessor's share of production so long as they are based on the lessee's actual cost of such enhancements. However, in no event shall Lessor receive a price that is less than, or more than, the price received by the Lessee.

(Exhibit 6, p. 7)

75.     Upon information and belief, the Defendants own or have owned the lessee's interests in more than one hundred leases which contain a Prohibits Deduction Clause which is substantially identical to the Prohibits Deduction Clause referenced above.

76.     In addition to the Parish Trust, numerous other members of Subclass III have Subclass III Royalty Agreements that contain a prohibits deduction royalty provision.

77.     Effective July 1, 2021, Riverbend acquired the lessee's interest in the Parish Trust Royalty Agreement and the other Subclass III Royalty Agreements.

78.     Effective May 1, 2022, the John Doe Defendant acquired the lessee's interest in the Parish Trust Royalty Agreement from Riverbend. On information and belief, the John Doe Defendant also acquired the lessee's interest in each of the other Subclass III Royalty Agreements.

79.     Since July 1, 2021, Flywheel has had an agreement with DeSoto, in which DeSoto charged Flywheel for certain midstream services for the natural gas produced from the Plaintiff and Subclass III members' Non-Op Wells. Flywheel then deducts these fees from the Plaintiff's and Subclass III members' royalty payments.

80.     DeSoto and Flywheel are affiliated companies which are both wholly owned subsidiaries of Flywheel Energy, LLC.

81.     After the midstream services are provided by DeSoto to transform the raw natural gas into a marketable form, all of the natural gas produced from the Plaintiff and Subclass III members' wells is transferred to a different Flywheel marketing affiliated entity, which then sells all the natural gas to third parties at a location downstream from the inlet of the interstate pipeline. Flywheel's marketing affiliated entity remits to proceeds to Flywheel based on a weighted average sales price (WASP) of the natural gas.

82.     All royalties paid by Flywheel to Plaintiff and the Subclass III members on behalf of the Defendants are calculated by using the WASP, and then deducting from the WASP the fees charged by DeSoto for the midstream services required to transform the raw gas into a marketable product which is sold to non-affiliated third-party purchasers.

83.     In the calculation and payment of royalties to the Plaintiff and the Subclass III members under the Subclass III Royalty Agreements, Flywheel does not pay royalties on behalf of the Defendants based upon the gross proceeds actually received on the sale of natural gas to third party purchasers as required by the Subclass III Royalty Agreements. Instead, Flywheel improperly deducts various post-production costs from the sales price of the natural gas in its calculation and payment of royalties to the Parish Trust and the Subclass III members.

84.     Because Flywheel calculates and pays royalties to the Parish Trust and Subclass III members under the Subclass III Royalty Agreements in the manner referenced above, Defendants have breached their contractual obligations to the Parish Trust and Subclass III under the Subclass III Royalty Agreements.

85.     As a direct result of the Defendants' breaches of the Subclass III Royalty Agreements as described above, Plaintiff Black and the members of the Subclass III have sustained substantial damages.

## SUBCLASS III CLASS ALLEGATIONS

86.     The claims of Plaintiff Black and the Subclass III members against Defendants satisfy each requirement for the certification of Fed. R. Civ. P. 23(b)(3) Class, as set forth below.

**NUMEROSITY – Federal Rule of Civil Procedure 23(a)(1)**

87.    The membership of Subclass III is so numerous that joinder of all Subclass III members is impracticable. On information and belief, there are more than five hundred members of Subclass III.

**COMMONALITY – Federal Rule of Civil Procedure 23(a)(2)**

88.    There are questions of law or fact common to the claims of the Subclass III members, including:

A. The extent of the Defendants' royalty payment obligations to Plaintiff Black and Subclass III under the Subclass III Royalty Agreements;

B. Whether the Defendants have breached their royalty payment obligations to Plaintiff Black and Subclass III under the Subclass III Royalty Agreements;

C. Whether the Defendants breached their contractual obligations under the Subclass III Royalty Agreements by deducting various post-production costs in the calculation of the Subclass III members' royalty payments;

D. Whether the Defendants should be required to pay prejudgment interest on all of the Subclass III members' royalty underpayments at the prejudgment interest rate of twelve percent per annum, pursuant to A.C.A. § 15-774-601(e).

**TYPICALITY – Federal Rule of Civil Procedure 23(a)(3)**

89.    Plaintiff Black's claims are typical of the claims of the members of Subclass III.

**ADEQUACY OF REPRESENTATION – Federal Rule of Civil Procedure 23(a)(4)**

90.    Plaintiff Black will fairly and adequately protect the interests of Subclass III, and he has retained counsel who are experienced in prosecuting class action royalty underpayment lawsuits against natural gas producers.

**PREDOMINANCE AND SUPERIORITY – Federal Rule of Civil Procedure 23(b)(3)**

91.    The questions of law or fact common to the members of Subclass III predominate over any individual questions which may exist.

92.     A class action is superior to other available methods for the fair and efficient adjudication of the Subclass III members' claims against the Defendants.

## COUNT VII – BREACH OF CONTRACT
### (Against Defendants on Behalf of Subclass III)

93.     The allegations contained in Paragraphs 1 through 92 of this class complaint, are restated and incorporated by reference herein.

94.     Defendants have breached their royalty payment obligations to Plaintiff Black and Subclass III under the Subclass III Royalty Agreements, by failing to pay royalties based upon the gross proceeds received on the sale of natural gas to third party purchasers at the pipeline interconnects without deductions.

95.     As a direct result of the failure to pay royalties to Subclass III members based on the proceeds received on the sale of natural gas, without deductions, Defendants have substantially underpaid the royalties owed to Plaintiff Black and Subclass III, causing Plaintiff Black and the Subclass III members sustain substantial damages.

## COUNT VIII – VIOLATION OF A.C.A. § 15-74-601(e)
### (Against Defendants on Behalf of Subclass III)

96.     Plaintiff Black incorporates by reference Paragraphs 1 through 95 of this class action complaint.

97.     Because the Defendants are responsible for the royalty payments to Plaintiff Black and the Subclass III members, which were substantially underpaid, Defendants are required to pay prejudgment interest on each royalty underpayment at a rate of twelve percent per annum simple interest, from the date of each royalty underpayment through the date of final judgement, pursuant to A.C.A. § 15-774-601(e).

## COUNT IX – DECLARATORY JUDGMENT
### (Against John Doe Defendant on Behalf of Subclass III)

98.     Plaintiff incorporates by reference Paragraphs 1 through 97 of this class action complaint.

99.     A controversy exists between Subclass III and the John Doe Defendant regarding the correct method of such Defendant's calculation and payment of royalties to Plaintiff and the Subclass III Royalty Agreements after the date of final judgment in this case ("future royalties").

100.    Plaintiff Black and Subclass III requests that the Court enter a declaratory judgment declaring that the John Doe Defendant is required to pay future royalties to Plaintiff Black and Subclass III under the Subclass III Royalty Agreements at issue, based upon the gross proceeds received on the sale of natural gas to third parties, without the deduction of post-production costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Black prays for the following relief:

A.     An Order that the claims asserted by Plaintiff Black, on behalf of the defined Subclass III, be certified as a class action pursuant to Fed. R. Civ. P. 23(b)(3), that Plaintiff Black, as Trustee of the Parish Trust, be appointed as the Subclass III Class Representative, and that attorneys George Barton and Stacy Burrows be appointed as Class Counsel for Subclass III;

B.     A judgment in favor of Plaintiff Black and the Subclass III members on their claim for Defendants' breach of the Subclass III Royalty Agreements at issue, in an amount which equals the full amount of Defendants' royalty underpayments since July 1, 2021, through the date of final judgement, plus applicable prejudgment interest.

C.    A judgment determining that Plaintiff Black and the members of Subclass III are entitled to recover prejudgment interest at the statutory interest rate of twelve percent per annum, pursuant to A.C.A. § 15-74-601(e);

E.    An award of court costs; and

F.    Such other relief as the Court deems just.

DATED: February 21, 2023,                    respectfully submitted,


                                             /s/ George A. Barton
                                             George A. Barton, Mo. Bar No. 26249
                                             Stacy A. Burrows, Co. Bar No. 49199
                                             Seth K. Jones, Ks. Bar No. 27262
                                             Barton and Burrows, LLC
                                             5201 Johnson Drive, Suite 110
                                             Mission, Kansas 66205
                                             Email: george@bartonburrows.com
                                                     stacy@bartonburrows.com
                                                     seth@bartonburrows.com
                                             Phone: (913) 563-6250

                                             ***ATTORNEYS FOR PLAINTIFFS AND
                                             THE PROPOSED SUBCLASSES***

# EXHIBIT 1





## Riverbend Energy Group Completes Sale of Non-Operated Portfolios

### Announces Key Personnel Addition to Growing Team

August 22, 2022 12:40 PM Eastern Daylight Time

HOUSTON--(BUSINESS WIRE)--Riverbend Energy Group ("Riverbend"), on behalf of certain of its affiliates and numerous institutional investors, announced today that it has completed the sale of its equity interests in Riverbend Oil & Gas VI, LLC, Riverbend Oil & Gas VI-B, LLC and Riverbend Oil & Gas VIII, LLC. Total purchase price for the transaction was $1.8 billion based on a May 1, 2022, effective date.

The divested portfolios represent a substantial, diversified asset base of non-operated interests across the Bakken/Three Forks, Utica, Fayetteville and Haynesville. As of the effective date, these properties produced approximately 47,000 barrels of oil equivalent per day from over 11,000 wells.

The close of this transaction marks the successful monetization for Riverbend of three of Riverbend's five active traditional energy portfolios. The company continues to manage and grow funds VII and IX, which target operated Midland Basin properties (Riverbend VII) and mineral and royalty interests across leading shale plays (Riverbend IX). Additionally, the company is pursuing non-operated working interest acquisitions in the Midland, Delaware, and Williston oil basins and Barnett, Fayetteville, Haynesville and Marcellus/Utica natural gas basins (Riverbend XI and/or successors). These hydrocarbon asset focused prospects are complimented by the growing energy transition opportunities that Riverbend is actively evaluating (Riverbend X).

"Our team has delivered a great result for a group of esteemed institutional investors once again through the execution of our proven acquisition and asset management process, leveraging our proprietary systems and in-house developed technology to aggregate high value assets," said Randy Newcomer, Jr., Riverbend's CEO. "We have now successfully monetized seven separate funds since our founding in 2003, establishing a consistent and enviable track record of value creation that reflects the excellence of our various disciplines as well as the grit and determination of our team to unearth opportunities in a highly volatile and dynamic business environment. We will continue to provide similar investment opportunities to institutional investors in the traditional energy business, alongside our rapidly expanding energy transition segment."

**Recent Key Personnel Addition**

Riverbend Energy Group also announced the addition of Ritu Sachdeva to augment the energy transition business.

Ritu Sachdeva joined the Riverbend team in June of 2022 as a Managing Director in the Energy Transition practice. She has over 18 years of leadership experience in Energy and Transition investing and operations. Prior to joining Riverbend, she served as the Chief Strategy Officer of Innowatts, a leading AI-enabled decarbonization SaaS platform, managing company strategy, fundraising, growth opportunities and partnerships. Prior to Innowatts, Ritu served in multiple senior management positions for Fortune 500 and FTSE 100 energy companies for 13 years. Ms. Sachdeva holds a BA in Economics and an MBA from University of Delhi and a Masters in Energy Finance from University of Texas at Austin.

**About Riverbend Energy Group**

Riverbend Energy Group, based in Houston, Texas, is a multi-faceted investment firm, utilizing risk-weighted deal evaluation processes to deploy capital into a variety of investment theses in the U.S. energy sector. As a trusted name in the energy investment space, Riverbend's portfolios have included, and continue to include, operated, non-operated, and mineral and royalty assets in traditional energy, as well as investments in the energy transition sector. Since 2003, Riverbend has successfully acquired, developed, and managed over $5 billion of total enterprise value across ten asset portfolios. For more information, visit riverbendenergygroup.com.

Contacts
Thomas Galloway, Riverbend Energy Group
tgalloway@riverbendeg.com

# EXHIBIT 2

```
CERTIFICATE OF RECORD
Doc# 20087622
Page #1
Date 07/25/2008
12:51:45 PM
Filed & Recorded in
Official Records of
STATE OF ARKANSAS
VAN BUREN COUNTY
ESTER BASS
CIRCUIT/COUNTY CLERK
Fees $60.00
BY: Limber Maddox C.
```

## OIL AND GAS LEASE
### (Arkansas — Paid-up)

This instrument was prepared by:
Gary A. Monroe & Associates
P. O. Box 2110
Fort Smith, AR 72902-2110

L0185112

THIS AGREEMENT made and entered into this **9th** day of **June**, 200**8**, by and between:

**Dan Larry Pennington, aka Larry Pennington and Freida M. Pennington, husband and wife**
**9721 Highway 92 East**
**Bee Branch, AR 72013**

hereinafter called Lessor and **Chesapeake Exploration, L.L.C., an Oklahoma limited liability company, P.O. Box 18496, Oklahoma City, Oklahoma 73154-0496,** hereinafter called Lessee. WITNESSETH, that Lessor, for and in consideration of the sum of Ten and more Dollars ($10.00 & more) in hand paid, and of the covenants and agreements hereinafter contained and to be performed by the Lessee, does hereby grant, demise, lease and let unto said Lessee, exclusively, the hereinafter described land for the purpose of carrying on geological, geophysical, seismic, and other exploration work and drilling and operating for, producing and saving all of the oil, gas (including casinghead gas, coal seam gas, coal bed methane gas, helium and all other constituents), and other hydrocarbons and laying pipelines, together with any reversionary rights therein, situated in the County of **Van Buren**, State of Arkansas, and described as follows:

**See Exhibit "A" attached hereto and made a part hereof for the legal description.**

Of Section **29**, Township **10 North**, Range **12 West**, and containing **4.31** acres, more or less, and also, in addition to the above–described land, any and all strips or parcels of land, other than those constituting regular governmental subdivisions, adjoining or contiguous to the above-described land and owned or claimed by Lessor, all of the foregoing land being hereinafter referred to as leased premises. It is the intention of the Lessor herein that the leased premises cover and include all lands owned or claimed by Lessor in the above-numbered governmental section or sections, together with any and all accretions thereto whether or not herein accurately and completely described.

   1. This Lease shall remain in force for a primary term of **Five(5)** years and as long thereafter as oil, gas or other hydrocarbons are produced from said leased premises or from lands pooled therewith.

Doc# 20087622

2. Lessee shall deliver, free of cost, to Lessor at the wells, or to the credit of Lessor in the pipeline to which the wells may be connected, the equal **1/5** part of all oil and other liquid hydrocarbons produced and saved from the leased premises, or at Lessee's option, to pay Lessor for such **1/5** royalty the market price at the well for such oil and other liquid hydrocarbons of like grade and gravity prevailing on the day such oil and other liquid hydrocarbons are run from the lease stock tanks.

3. Lessee shall pay or, if required by law, contribute to be paid to Lessor **1/5** of the net proceeds realized by Lessee for all gas (including all substances contained in such gas) produced from the leased premises and sold by Lessee, less Lessor's proportionate share of taxes and all costs incurred by Lessee in delivering, processing, compressing or otherwise making such gas or other substances merchantable or enhancing the marketing thereof. If such gas is used by Lessee off the leased premises or used by Lessee for the manufacture of casinghead gasoline or other products, Lessee shall pay Lessor **1/5** of the prevailing market value at the well for the gas so used.

4. If a well capable of producing gas or gas and gas condensate in paying quantities located on the leased premises (or on acreage pooled or consolidated with all or a portion of the leased premises into a unit for the drilling or operation of such well) is at any time shut in and no gas or gas condensate therefrom is sold or used off the premises or for the manufacture of gasoline or other products, nevertheless such shut-in well shall be deemed to be a well on the leased premises producing gas in paying quantities and this Lease will continue in force during all of the time or times while such shut-in well is so shut in, whether before or after the expiration of the primary term hereof. Lessee shall use reasonable diligence to market gas or gas condensate capable of being produced from such shut-in well but shall be under no obligation to market such products under terms, conditions or circumstances which, in Lessee's judgment exercised in good faith, are unsatisfactory. Lessee shall be obligated to pay or tender to Lessor within 45 days after the expiration of each period of one year length (annual period) during which such well is so shut in, a royalty of One Dollar ($1.00) per net royalty acre retained hereunder as of the end of such annual period; provided that, if gas or gas condensate from such well is sold or used as aforesaid before the end of any such annual period, or if, at the end of any such annual period, this Lease is being maintained in force and effect otherwise than by reason of such shut-in well, Lessee shall not be obligated to pay or tender, for that particular annual period, said sum of money. Such payment shall be deemed a royalty under all provisions of this Lease. Lessee's failure to pay or tender such payment, for any reason, shall render Lessee liable for the amount due, but shall not operate to terminate this lease. Such payment shall be made or tendered to Lessor at the above address or to his successors. Royalty ownership as of the last day of each such annual period as shown by Lessee's records shall govern the determination of the party or parties entitled to receive such payment.

5. Lessee hereby is given the right at its option, at any time and whether before or after production, to pool for development and operation purposes all or any part or parts of the leased premises or rights therein with any other land in the vicinity thereof, or with any leasehold, operating or other rights or interests in such other land so as to create units of such size and surface acreage as Lessee may desire but containing not more than forty-five (45) acres; provided, however, a unit may be established hereunder containing not more than 640 acres plus 10% acreage tolerance if unitized only as to gas rights or only as to gas and gas condensate, except that units pooled for oil or oil and gas for or in conjunction with repressuring, pressure maintenance, cycling and secondary recovery operations or any one or more of same, may be formed to include no more than 320 acres. If at any time larger units are required under any then applicable law, rule, regulations or order of any governmental authority for the drilling, completion or operation of a well, or for obtaining maximum allowable for any contemplated, drilling or completed well, any such unit may be established or enlarged to conform to the size specified by such law, rule, regulation or order.

Operations on any part of any lands so pooled shall, except for the payment of royalties, be considered operations on leased premises under this Lease, and, notwithstanding the status of a well at the time of pooling, such operations shall be deemed to be in connection with a well which is

Doc# 20087622

commenced on leased premises under this Lease. The term "operations" as used herein shall include, without limitation, the following: commencing, construction of roadways, preparation of drillsite, drilling, testing, completing, reworking, recompleting, deepening, plugging back, repressuring, pressuring maintenance, cycling, secondary recovery operations, or the production of oil or gas, or the existence of a shut-in well capable of producing oil or gas.

There shall be allocated to the portion of leased premises included in any such pooling such proportion of the actual production from all lands so pooled as such portion as leased premises, computed on an acreage basis, bears to the entire acreage of the lands so pooled. The production so allocated shall be considered for the purpose of payment or delivery or royalty to be the entire production for the portion of leased premises included in such pooling in the same manner as though produced from such portion of leased premises under the terms of this Lease.

6. If the Lessor owns a lesser interest in the above-described land than the entire and undivided mineral estate therein, then the royalties herein provided for shall be paid to the said Lessor only in the proportion which his interest bears to the whole and undivided mineral estate.

7. If the estate of either party hereto is assigned, and the privilege of assigning in whole or in part is hereby expressly allowed, the covenants hereof shall extend to their heirs, executors, administrators, successors or assigns, but no change in the ownership of the land or the minerals in and under the same or assignment of royalties shall be binding on Lessee unless Lessee shall have been furnished ninety (90) days before payment hereunder of such royalties, with certified copies of recorded instruments showing evidence of title.

8. Lessee shall have the right to use, free of cost, gas, oil and water found on said land for its operations, except water from the wells of the Lessor. When required by the Lessor, the Lessee shall bury its pipelines below plow depth and shall pay reasonable damages for injury by reason of its operations to growing crops on said land. No well shall be drilled nearer than 200 feet to any house or barn or other structure on said premises as of the date of this Lease without the written consent of the Lessor. Lessee shall have the right at any time during, or after the expiration of this Lease to enter upon the property and to remove all machinery, fixtures, and other structures placed on said premises, including the right to draw and move all casing, but the Lessee shall be under no obligation to do so.

9. Notwithstanding anything contained in this Lease to the contrary, it is expressly agreed that if the Lessee shall commence operations as provided herein at any time while this Lease is in force, this Lease shall remain in force and its terms shall continue so long as such operations are prosecuted, and if production results therefrom, then as long as production is maintained.

10. If, after the expiration of the primary term of this Lease, production on the leased premises should cease from any cause, this Lease shall not terminate provided Lessee commences operations for additional drilling or reworking within sixty (60) days from such cessation, and this Lease shall remain in force during the prosecution of such operations and if production results therefrom, then as long as production is maintained.

11. Lessee may at any time surrender or cancel this Lease in whole or in part by delivering or mailing such release to the Lessor, or by placing such release of record in the proper County. In case this Lease is surrendered or cancelled as to only a portion of the acreage covered thereby, then all payments and liabilities thereafter accruing under the terms of this Lease as to the portion cancelled shall cease. As to the portion of the acreage not released, the terms and provisions of this Lease shall continue and remain in full force and effect for all purposes.

12. All provisions hereof, express or implied, shall be subject to all Federal and State Laws and the orders, rules, and regulations of all governmental agencies administering the same, and this Lease shall not in any way be terminated wholly or partially, nor shall the Lessee be liable in damages for failure to comply with any of the express or implied provisions hereof if such failure accords with any such laws, orders, rules or regulations. Should the Lessee be prevented during the last year of the primary term hereof from drilling a well hereunder by the order of any constituted authority having jurisdiction, or if Lessee shall be unable during said period to drill a well hereunder due to the equipment necessary in the drilling thereof not being available for any cause, the primary

Doc# 20087622

term of this Lease shall continue until one year after said order is suspended or said equipment is available.

13. Lessor hereby warrants and agrees to defend the title to the land herein described and agrees that the Lessee, at its option, may pay or discharge in whole or in part any taxes, encumbrances, or other liens existing, levied or assessed against the above-described lands, and in the event Lessee exercises such option, it shall be subrogated to the rights of any holder or holders thereof and may reimburse itself by applying any royalty accruing hereunder to the amount of any such encumbrance, tax or other lien paid by Lessee.

14. Lessee hereby is given the right to acquire for its own benefit deeds, leases, or assignments covering any interest or claim in leased premises which Lessee or any other party contends is outstanding and not covered hereby and even though such outstanding interest or claim be invalid or adverse to Lessor. In the event the validity of this Lease be disputed by Lessor or by any other person, then, for the period such dispute remains undisposed of, Lessee shall be relieved of all obligations hereunder to explore or develop leased premises; all royalties or other payments which would otherwise accrue shall be suspended for such period; and this Lease automatically shall be extended for an additional period equal to the duration of such period.

15. If, at any time within the primary term of this Lease and while the same remains in force and effect, Lessor receives any bona fide offer, acceptable to Lessor, to grant an additional Lease (top lease) covering all or part of the afore-described lands, Lessee shall have the continuing option by meeting any such offer to acquire such top lease. Any offer must be in writing, and must set forth the proposed Lessee's name, bonus consideration and royalty consideration to be paid for such Lease, and include a copy of the Lease form to be utilized which form should reflect all pertinent and relevant terms and conditions of the top lease. Lessee shall have fifteen (15) days after receipt, from Lessor, of a complete copy of any such offer to advise Lessor in writing of its election to enter into an oil and gas Lease with Lessor on equivalent terms and conditions. If Lessee fails to notify Lessor within the aforesaid fifteen (15) day period of its election to meet any such bona fide offer, Lessor shall have the right to accept said offer.

16. It is specifically understood that each wife and husband named herein and executing this Lease, for the consideration above set out, and the covenants and agreements contained in this Lease to be performed by the Lessee, does hereby release and relinquish unto said Lessee all right of dower, curtesy and homestead in and to the lands covered hereby for the purpose of this Lease.

17. This Lease and all its terms, conditions and stipulations shall extend to and be binding on all successors in title of said Lessor or Lessee.

18. It is the intent of the Lessor to lease all of Lessor's interest in and to the Section described herein, whether or not the tracts recited hereon are properly described, and further it is understood that this Lease includes all rights owned by the Lessor in this Section whether or not correctly described and any other properties owned by the Lessor in the drilling and spacing unit for this well, including without limitation, strips, gores, alleyways, roadways, accretions and avulsions.

**See Exhibit "B" for addendums to this lease attached hereto and made a part hereof.**

IN WITNESS WHEREOF, this Lease is executed as of date first set out herein above.

Lessor:    Dan Larry Pennington, aka Larry Pennington

Lessor:    Freida M. Pennington

## ACKNOWLEDGEMENT    Doc# 20087622

STATE OF _Arkansas_
COUNTY OF _Faulkner_

Before me, the undersigned Notary Public in and for the above county and state, on this day personally appeared **Dan Larry Pennington, aka Larry Pennington and Freida M. Pennington, husband and wife**, known to me to be the person(s) whose name(s) is/are subscribed to the foregoing instrument, and acknowledged that he/she/they executed the same as his/her/their free and voluntary act and deed for the purposes and consideration therein expressed, including the relinquishment of curtesy, dower, and homestead.

Given under my hand and seal of office this _9_ day of _June_ , 2008.

My Commission Expires:

_____
Notary Public

_____
SEAL

```
┌─────────────────────────────────────┐
│            RANDY BEAVERS             │
│ NOTARY PUBLIC-STATE OF ARKANSAS      │
│            FAULKNER COUNTY           │
│  My Commission Expires 9-15-2016     │
│       Commission # 12350392          │
└─────────────────────────────────────┘
```

Doc# 20087622

## Exhibit "A"

**Attached hereto and made a part of that certain Oil and Gas Lease dated <u>June 9th, 2008</u>, by and between <u>Dan Larry Pennington, aka Larry Pennington and Freida M. Pennington, husband and wife</u>, as Lessor, and Chesapeake Exploration, L.L.C., an Oklahoma limited partnership, as Lessee.**

## Section 29, Township 10 North, Range 12 West

All that part of the following described lands in Section 29, Township 10 North, Range 12 West containing **4.31 acres**, more or less, more particularly described as:  Beginning at the common corner of Sections 20, 21, 28, and 29; thence North 88 degrees 27 minutes 55 seconds West 156.32 feet along the South line of Section 20, to a point in the center of a creek; thence along the center of said creek the following courses, South 69 degrees 28 minutes 06 seconds West 250.33 feet to a point; thence South 62 degrees 23 minutes 00 seconds West 200.47 feet to a point; thence South 78 degrees 29 minutes 53 seconds West 180.26 feet to a point; thence South 63 degrees 30 minutes 03 seconds West 184.86 feet to a point where the center of said creek intersects a creek Northwesterly; thence along the center of Northwesterly creek the following courses, North 56 degrees 20 minutes 34 seconds West 162.20 feet to a point; thence North 49 degrees 05 minutes 18 seconds West 134.30 feet to a point; thence North 37 degrees 03 minutes 21 seconds West 107.05 feet to a point; thence North 62 degrees 38 minutes 40 seconds West 92.84 feet to a point; thence South 53 degrees 12 minutes 46 seconds West 39.47 feet to a point where the center of said creek intersects the West line of the NE/4 NE/4, Section 29; thence North 01 degrees 41 minutes 21 seconds East 48.15 feet to the Northwest Corner of the NE/4 NE/4, Section 29; thence North 00 degrees 58 minutes 10 seconds East 1322.34 feet to the Northwest Corner of the SE/4 SE/4, Section 20; thence continue North 00 degrees 58 minutes 10 seconds East 1322.34 feet to the Northwest Corner of the NE/4 SE/4, Section 20; thence South 88 degrees 23 minutes 49 seconds East 1319.15 feet to the Northeast Corner of the NE/4 SE/4, Section 20; thence South 00 degrees 51 minutes 07 seconds West 1321.58 feet to the Southeast Corner of the NE/4 SE/4, Section 20; thence South 88 degrees 13 minutes 16 seconds East 1098.20 feet along the South line of the NW/4 SW/4, Section 21, to a point in the center of County Road Number 46; thence along the center of said road the following courses:  South 22 degrees 40 minutes 03 seconds West 55.72 feet to a point; thence South 16 degrees 53 minutes 27 seconds West 302.16 feet to a point; thence leaving said road, South 88 degrees 13 minutes 16 seconds East 326.44 feet to a point on the East line of the SW/4 SW/4, Section 21; thence South 00 degrees 56 minutes 51 seconds West 432.58 feet; along the East line of the SW/4 SW/4, Section 21, to a point in the center of a creek; thence along center of said creek the following courses:  South 70 degrees 05 minutes 03 seconds West 50.39 feet to a point; thence South 64 degrees 47 minutes 48 seconds West 132.94 feet to a point; thence South 59 degrees 40 minutes 18 seconds West 137.05 feet to a point where center of said creek intersects the center or County Road Number 46; thence along the center of said road, along a non-tangent curve to the right, having a radius of 129.97 feet, a cord bearing and distance of South 07 degrees 09 minutes 32 seconds West 171.43 feet, to a point; thence along center of said road, South 36 degrees 00 minutes 51 seconds West 140.60 feet, to a point; thence along center of said road, South 66 degrees 41 minutes 39 seconds West 46.08 feet to a point where the center of said road intersects the center of a creek Southeasterly; thence along the center of said creek; South 32 degrees 09 minutes 41 seconds East 106.74 feet to a point where the center of said creek intersects the South line of the SW/4 SW/4, Section 21; thence North 88 degrees 07 minutes 11 seconds West 952.21 feet to the point of beginning.

Doc# 20087622

Containing in the aggregate **4.31 acres**, more or less.

Signed for Identification: _____
Dan Larry Pennington, aka Larry Pennington

Signed for Identification: _____
Freida M. Pennington

Doc# 20087622

## Exhibit "B"

**Attached hereto and made a part of that certain Oil and Gas Lease dated <u>June 9th, 2008</u>, by and between <u>Dan Larry Pennington, aka Larry Pennington and Freida M. Pennington, husband and wife</u>, as Lessor, and Chesapeake Exploration, L.L.C., an Oklahoma limited partnership, as Lessee.**

1. <u>Scope of Addendum</u>
   The terms, agreements, conditions and provisions of the Addendum shall govern the relationship as between the Lessor and the Lessee notwithstanding any contrary provision of the Lease.

2. <u>Limitation on Means of Extraction</u>
   Extraction of oil or gas from the lands which are the subject matter of the Lease may be accomplished only through a borehole.  No strip mining or other extraction method which substantially destroys the surface of the leased lands may be employed.

3. <u>Entry on Leased Land</u>

   3.1 <u>Entry for Drilling Operations</u>
   Prior to the commencement of any drilling operations upon the leased land, the Lessee shall confer with the Lessor as to the Lessee's desired means of ingress and egress to the drill site(s) from public right of way, and such means of access shall be subject to Lessor's prior approval, which approval shall not be unreasonably withheld.  Lessee's agents, employees and contractors shall thereafter be limited to ingress and egress to the drill site by way of such approved means of access. The approval by Lessor of the location of any means of access shall not constitute a waiver of compensation for use of the property within the means of access.

   3.2 <u>Roadways to be Constructed</u>
   Any roadway to be constructed from public right of way to any drill site on the leased land shall be constructed in a fashion and of such materials as to support the equipment traversing such means of access, and to avoid any damages to the surrounding surface area of the leased lands. Roadbeds to be constructed with a minimum of a 6" gravel base. Cattle guards and gates will be installed on constructed roadways at entry to leased lands.

4. <u>Pipelines</u>

   4.1 <u>Method of Installation</u>
   All pipelines installed upon the leased land shall be buried to a depth of at least 40 inches, and shall be installed utilizing a double ditching method such that the top soil removed during excavation is re-installed as the final layer when the pipeline is installed.

5. <u>Utility Installations</u>
   All utility lines required for the operation of any well shall be installed within the area approved by the Lessor for the construction of the means of access to the well site.

6. <u>Shut-In-Wells</u>
   Notwithstanding any contrary provision of the Lease, no shut-in well shall be deemed to be a well upon the leased land producing gas in paying quantities for more than three (3) consecutive years from the date the well is shut-in.  Further, notwithstanding the provisions of the Lease, the

annual royalty which shall be paid for a shut-in well shall be equal to $5.00 per net mineral acre for acreage covered by the Lease.

7. Use of Water
   Notwithstanding any contrary provision of the Lease, the Lessee shall have no right to use of any surface water on the leased land; any water from Lessor's existing wells; or to drill water wells on the leased land without written consent of Lessor and said consent will not be unreasonably withheld.

8. Operations on Leased Land

   8.1 Fencing on Well Site
       The Lessee shall build and maintain fencing around the well site and all adjacent areas utilized by the Lessee in connection with any production operations.

   8.2 Damages
       Lessee shall repair, as nearly as practicable, all damages of any kind or character to the leased lands and improvements thereon which might be caused by the Lessee, its agents, servants, employees, sub-contractors, successors and assigns, and Lessee shall pay all damages resulting from operations under the Lease, including, without limitation, damages to any personal property, improvements, livestock, pastures, fences and fencing, ditches, roadways, and crops upon the leased land. For purposes hereof, trees shall be deemed growing crops.

   8.3 Restoration of Surface
       Whenever practical, Lessee will restore the surface of the lease lands after completion of each well to substantially the same condition as existed prior to commencement of operations upon the leased lands.

   8.4 Environmental Matters
       Lessee shall use the highest degree of care and all reasonable safeguards to prevent, the contamination or pollution of the soil, sub-soil, surface waters, groundwater, sediment, surface and sub-surface strata, ambient air, or any other environmental medium in, on, or under the leased lands, or any adjacent lands, whether or not owned by the Lessor, by any waste, pollutant or contaminant. Lessee shall not bring, discharge, or permit to remain, on the leased lands, any explosives, toxic materials or substances regulated as hazardous wastes, substances or materials or toxic substances or materials under any Federal, State or Local law, regulation or order (collectively, "Hazardous Materials"), except those products, in those quantities, normally utilized in connection with oil and gas exploration and production activities. Lessee shall clean up, remove, remedy and repair any release or contamination to the leased lands by Hazardous Materials caused by its operations upon the leased lands, or any adjoining lands, and shall indemnify and save the Lessor harmless of and from any and all liability, cost, expense or claim of any nature or kind whatsoever, arising out of the release or discharge of any such Hazardous Materials. The provisions of the Section shall survive the termination or expiration of the Lease.

   8.5 Insurance and Indemnity
       The Lessee shall indemnify and hold the Lessor, the Lessor's heirs, successors, personal representatives and assigns, harmless of and from all claims and suits for damages arising out of the Lessee's operations or entry upon the leased lands, including, without limitation, claims for damages arising out of personal injury or death to any person,

Doc# 20087622

property damage, including environmental damages, and all other claims or damages, including exemplary damages, of any nature or kind whatsoever, this indemnity to include any attorney's fees or other costs or expenses reasonably incurred by the Lessor in defending or investigating any such claim or action.

8.6    <u>Lack of Drilling Equipment</u>
This lease cannot be extended for lack of drilling equipment.

8.7    <u>Drilling Limitation</u>
No well to be drilled on leased premises within 300 feet of any house or structure located on the said premises as of the date of this lease without the written consent of the Lessor.

## THE BODY OF THE ATTACHED OIL AND GAS LEASE IS HEREBY AMENDED AS FOLLOWS:

Paragraph 3. is hereby amended to read as follows:

To pay Lessor for gas of whatsoever nature or kind (with all of its constituents), including but not limited to casinghead gas, coal seam gas, coal bed methane, and all other gaseous or vaporous substances, produced and sold or used off the lease premises or used in the manufacture of products therefrom, **1/5** of the gross proceeds for the gas sold, used off the premises, or in the manufacture of products therefrom, but in no event more than **1/5** of the actual amount received by the Lessee, said payments to be made monthly.  Also, to pay Lessor **1/5** of the gross proceeds for any chemicals, chemical compounds or elements associated with brine production which may be sold or used off the premises, but in no event more than **1/5** of the actual amount received by the Lessee, said payments to be made monthly.

Signed for Identification:    _Dan Larry Pennington_
                             **Dan Larry Pennington, aka Larry Pennington**

Signed for Identification:    _Freida M._
                             **Freida M. Pennington**

Record & Return to:
Chesapeake Operating, Inc.
P.O. Box 18496
Oklahoma City, OK  73154

# EXHIBIT 3

```
CERTIFICATE OF RECORD
Doc# 20087621
Page #1
Date 07/25/2008
12:51:44 PM
Filed & Recorded in
Official Records of
STATE OF ARKANSAS
VAN BUREN COUNTY
ESTER BASS
CIRCUIT/COUNTY CLERK
Fees $50.00
BY: Amber Maddox C.
```

## OIL AND GAS LEASE

(Arkansas — Paid-up)

This instrument was prepared by:          L0185113
Gary A. Monroe & Associates
P. O. Box 2110
Fort Smith, AR 72902-2110

THIS AGREEMENT made and entered into this **9th** day of **June**, 20**08**, by and between:

**Dan Larry Pennington, aka Larry Pennington and Freida M. Pennington, husband and wife**
**9721 Highway 92 East**
**Bee Branch, AR 72013**

hereinafter called Lessor and **Chesapeake Exploration, L.L.C., an Oklahoma limited liability company, P.O. Box 18496, Oklahoma City, Oklahoma 73154-0496,** hereinafter called Lessee. WITNESSETH, that Lessor, for and in consideration of the sum of Ten and more Dollars ($10.00 & more) in hand paid, and of the covenants and agreements hereinafter contained and to be performed by the Lessee, does hereby grant, demise, lease and let unto said Lessee, exclusively, the hereinafter described land for the purpose of carrying on geological, geophysical, seismic, and other exploration work and drilling and operating for, producing and saving all of the oil, gas (including casinghead gas, coal seam gas, coal bed methane gas, helium and all other constituents), and other hydrocarbons and laying pipelines, together with any reversionary rights therein, situated in the County of **Van Buren**, State of Arkansas, and described as follows:

**The NE/4 SE/4 of Section 20, Township 10 North, Range 12 West, containing 40.00 acres, more or less.**

**The SE/4 SE/4 of Section 20, Township 10 North, Range 12 West, containing 40.00 acres, more or less.**

Of Section **20**, Township **10 North**, Range **12 West**, and containing **80.00** acres, more or less, and also, in addition to the above–described land, any and all strips or parcels of land, other than those constituting regular governmental subdivisions, adjoining or contiguous to the above-described land and owned or claimed by Lessor, all of the foregoing land being hereinafter referred to as leased premises. It is the intention of the Lessor herein that the leased premises cover and include all lands owned or claimed by Lessor in the above-numbered governmental section or sections, together with any and all accretions thereto whether or not herein accurately and completely described.

    1. This Lease shall remain in force for a primary term of **Five(5)** years and as long thereafter as oil, gas or other hydrocarbons are produced from said leased premises or from lands pooled therewith.

2. Lessee shall deliver, free of cost, to Lessor at the wells, or to the credit of Lessor in the pipeline to which the wells may be connected, the equal ___**1/5**___ part of all oil and other liquid hydrocarbons produced and saved from the leased premises, or at Lessee's option, to pay Lessor for such ___**1/5**___ royalty the market price at the well for such oil and other liquid hydrocarbons of like grade and gravity prevailing on the day such oil and other liquid hydrocarbons are run from the lease stock tanks.

3. Lessee shall pay or, if required by law, contribute to be paid to Lessor ___**1/5**___ of the net proceeds realized by Lessee for all gas (including all substances contained in such gas) produced from the leased premises and sold by Lessee, less Lessor's proportionate share of taxes and all costs incurred by Lessee in delivering, processing, compressing or otherwise making such gas or other substances merchantable or enhancing the marketing thereof. If such gas is used by Lessee off the leased premises or used by Lessee for the manufacture of casinghead gasoline or other products, Lessee shall pay Lessor **1/5** of the prevailing market value at the well for the gas so used.

4. If a well capable of producing gas or gas and gas condensate in paying quantities located on the leased premises (or on acreage pooled or consolidated with all or a portion of the leased premises into a unit for the drilling or operation of such well) is at any time shut in and no gas or gas condensate therefrom is sold or used off the premises or for the manufacture of gasoline or other products, nevertheless such shut-in well shall be deemed to be a well on the leased premises producing gas in paying quantities and this Lease will continue in force during all of the time or times while such shut-in well is so shut in, whether before or after the expiration of the primary term hereof. Lessee shall use reasonable diligence to market gas or gas condensate capable of being produced from such shut-in well but shall be under no obligation to market such products under terms, conditions or circumstances which, in Lessee's judgment exercised in good faith, are unsatisfactory. Lessee shall be obligated to pay or tender to Lessor within 45 days after the expiration of each period of one year length (annual period) during which such well is so shut in, a royalty of One Dollar ($1.00) per net royalty acre retained hereunder as of the end of such annual period; provided that, if gas or gas condensate from such well is sold or used as aforesaid before the end of any such annual period, or if, at the end of any such annual period, this Lease is being maintained in force and effect otherwise than by reason of such shut-in well, Lessee shall not be obligated to pay or tender, for that particular annual period, said sum of money. Such payment shall be deemed a royalty under all provisions of this Lease. Lessee's failure to pay or tender such payment, for any reason, shall render Lessee liable for the amount due, but shall not operate to terminate this lease. Such payment shall be made or tendered to Lessor at the above address or to his successors. Royalty ownership as of the last day of each such annual period as shown by Lessee's records shall govern the determination of the party or parties entitled to receive such payment.

5. Lessee hereby is given the right at its option, at any time and whether before or after production, to pool for development and operation purposes all or any part or parts of the leased premises or rights therein with any other land in the vicinity thereof, or with any leasehold, operating or other rights or interests in such other land so as to create units of such size and surface acreage as Lessee may desire but containing not more than forty-five (45) acres; provided, however, a unit may be established hereunder containing not more than 640 acres plus 10% acreage tolerance if unitized only as to gas rights or only as to gas and gas condensate, except that units pooled for oil or oil and gas for or in conjunction with repressuring, pressure maintenance, cycling and secondary recovery operations or any one or more of same, may be formed to include no more than 320 acres. If at any time larger units are required under any then applicable law, rule, regulations or order of any governmental authority for the drilling, completion or operation of a well, or for obtaining maximum allowable for any contemplated, drilling or completed well, any such unit may be established or enlarged to conform to the size specified by such law, rule, regulation or order.

Operations on any part of any lands so pooled shall, except for the payment of royalties, be considered operations on leased premises under this Lease, and, notwithstanding the status of a well

Doc# 20087621

at the time of pooling, such operations shall be deemed to be in connection with a well which is commenced on leased premises under this Lease. The term "operations" as used herein shall include, without limitation, the following: commencing, construction of roadways, preparation of drillsite, drilling, testing, completing, reworking, recompleting, deepening, plugging back, repressuring, pressuring maintenance, cycling, secondary recovery operations, or the production of oil or gas, or the existence of a shut-in well capable of producing oil or gas.

There shall be allocated to the portion of leased premises included in any such pooling such proportion of the actual production from all lands so pooled as such portion as leased premises, computed on an acreage basis, bears to the entire acreage of the lands so pooled. The production so allocated shall be considered for the purpose of payment or delivery or royalty to be the entire production for the portion of leased premises included in such pooling in the same manner as though produced from such portion of leased premises under the terms of this Lease.

6. If the Lessor owns a lesser interest in the above-described land than the entire and undivided mineral estate therein, then the royalties herein provided for shall be paid to the said Lessor only in the proportion which his interest bears to the whole and undivided mineral estate.

7. If the estate of either party hereto is assigned, and the privilege of assigning in whole or in part is hereby expressly allowed, the covenants hereof shall extend to their heirs, executors, administrators, successors or assigns, but no change in the ownership of the land or the minerals in and under the same or assignment of royalties shall be binding on Lessee unless Lessee shall have been furnished ninety (90) days before payment hereunder of such royalties, with certified copies of recorded instruments showing evidence of title.

8. Lessee shall have the right to use, free of cost, gas, oil and water found on said land for its operations, except water from the wells of the Lessor. When required by the Lessor, the Lessee shall bury its pipelines below plow depth and shall pay reasonable damages for injury by reason of its operations to growing crops on said land. No well shall be drilled nearer than 200 feet to any house or barn or other structure on said premises as of the date of this Lease without the written consent of the Lessor. Lessee shall have the right at any time during, or after the expiration of this Lease to enter upon the property and to remove all machinery, fixtures, and other structures placed on said premises, including the right to draw and move all casing, but the Lessee shall be under no obligation to do so.

9. Notwithstanding anything contained in this Lease to the contrary, it is expressly agreed that if the Lessee shall commence operations as provided herein at any time while this Lease is in force, this Lease shall remain in force and its terms shall continue so long as such operations are prosecuted, and if production results therefrom, then as long as production is maintained.

10. If, after the expiration of the primary term of this Lease, production on the leased premises should cease from any cause, this Lease shall not terminate provided Lessee commences operations for additional drilling or reworking within sixty (60) days from such cessation, and this Lease shall remain in force during the prosecution of such operations and if production results therefrom, then as long as production is maintained.

11. Lessee may at any time surrender or cancel this Lease in whole or in part by delivering or mailing such release to the Lessor, or by placing such release of record in the proper County. In case this Lease is surrendered or cancelled as to only a portion of the acreage covered thereby, then all payments and liabilities thereafter accruing under the terms of this Lease as to the portion cancelled shall cease. As to the portion of the acreage not released, the terms and provisions of this Lease shall continue and remain in full force and effect for all purposes.

12. All provisions hereof, express or implied, shall be subject to all Federal and State Laws and the orders, rules, and regulations of all governmental agencies administering the same, and this Lease shall not in any way be terminated wholly or partially, nor shall the Lessee be liable in damages for failure to comply with any of the express or implied provisions hereof if such failure accords with any such laws, orders, rules or regulations. Should the Lessee be prevented during the last year of the primary term hereof from drilling a well hereunder by the order of any constituted authority having jurisdiction, or if Lessee shall be unable during said period to drill a well hereunder

Doc# 20087621

due to the equipment necessary in the drilling thereof not being available for any cause, the primary term of this Lease shall continue until one year after said order is suspended or said equipment is available.

13. Lessor hereby warrants and agrees to defend the title to the land herein described and agrees that the Lessee, at its option, may pay or discharge in whole or in part any taxes, encumbrances, or other liens existing, levied or assessed against the above-described lands, and in the event Lessee exercises such option, it shall be subrogated to the rights of any holder or holders thereof and may reimburse itself by applying any royalty accruing hereunder to the amount of any such encumbrance, tax or other lien paid by Lessee.

14. Lessee hereby is given the right to acquire for its own benefit deeds, leases, or assignments covering any interest or claim in leased premises which Lessee or any other party contends is outstanding and not covered hereby and even though such outstanding interest or claim be invalid or adverse to Lessor. In the event the validity of this Lease be disputed by Lessor or by any other person, then, for the period such dispute remains undisposed of, Lessee shall be relieved of all obligations hereunder to explore or develop leased premises; all royalties or other payments which would otherwise accrue shall be suspended for such period; and this Lease automatically shall be extended for an additional period equal to the duration of such period.

15. If, at any time within the primary term of this Lease and while the same remains in force and effect, Lessor receives any bona fide offer, acceptable to Lessor, to grant an additional Lease (top lease) covering all or part of the afore-described lands, Lessee shall have the continuing option by meeting any such offer to acquire such top lease. Any offer must be in writing, and must set forth the proposed Lessee's name, bonus consideration and royalty consideration to be paid for such Lease, and include a copy of the Lease form to be utilized which form should reflect all pertinent and relevant terms and conditions of the top lease. Lessee shall have fifteen (15) days after receipt, from Lessor, of a complete copy of any such offer to advise Lessor in writing of its election to enter into an oil and gas Lease with Lessor on equivalent terms and conditions. If Lessee fails to notify Lessor within the aforesaid fifteen (15) day period of its election to meet any such bona fide offer, Lessor shall have the right to accept said offer.

16. It is specifically understood that each wife and husband named herein and executing this Lease, for the consideration above set out, and the covenants and agreements contained in this Lease to be performed by the Lessee, does hereby release and relinquish unto said Lessee all right of dower, curtesy and homestead in and to the lands covered hereby for the purpose of this Lease.

17. This Lease and all its terms, conditions and stipulations shall extend to and be binding on all successors in title of said Lessor or Lessee.

18. It is the intent of the Lessor to lease all of Lessor's interest in and to the Section described herein, whether or not the tracts recited hereon are properly described, and further it is understood that this Lease includes all rights owned by the Lessor in this Section whether or not correctly described and any other properties owned by the Lessor in the drilling and spacing unit for this well, including without limitation, strips, gores, alleyways, roadways, accretions and avulsions.

**See Exhibit "A" for addendums to this lease attached hereto and made a part hereof.**

IN WITNESS WHEREOF, this Lease is executed as of date first set out herein above.

Lessor:   **Dan Larry Pennington, aka Larry Pennington**

Lessor:   **Freida M. Pennington**

Doc# 20087621

## ACKNOWLEDGEMENT

STATE OF *Arkansas*
COUNTY OF *Faulkner*

Before me, the undersigned Notary Public in and for the above county and state, on this day personally appeared **Dan Larry Pennington, aka Larry Pennington and Freida M. Pennington, husband and wife**, known to me to be the person(s) whose name(s) is/are subscribed to the foregoing instrument, and acknowledged that he/she/they executed the same as his/her/their free and voluntary act and deed for the purposes and consideration therein expressed, including the relinquishment of curtesy, dower, and homestead.

Given under my hand and seal of office this _____ 9 _____ day of *June* _____, 2008.

My Commission Expires:

_____        _____
                                 Notary Public
        SEAL

```
RANDY BEAVERS
NOTARY PUBLIC-STATE OF ARKANSAS
FAULKNER COUNTY
My Commission Expires 9-15-2016
Commission # 12350392
```

Doc# 20087621

## Exhibit "A"

**Attached hereto and made a part of that certain Oil and Gas Lease dated <u>June 9th, 2008</u>, by and between <u>Dan Larry Pennington, aka Larry Pennington and Freida M. Pennington, husband and wife</u>, as Lessor, and Chesapeake Exploration, L.L.C., an Oklahoma limited partnership, as Lessee.**

1.  <u>Scope of Addendum</u>
    The terms, agreements, conditions and provisions of the Addendum shall govern the relationship as between the Lessor and the Lessee notwithstanding any contrary provision of the Lease.

2.  <u>Limitation on Means of Extraction</u>
    Extraction of oil or gas from the lands which are the subject matter of the Lease may be accomplished only through a borehole. No strip mining or other extraction method which substantially destroys the surface of the leased lands may be employed.

3.  <u>Entry on Leased Land</u>

    3.1  <u>Entry for Drilling Operations</u>
         Prior to the commencement of any drilling operations upon the leased land, the Lessee shall confer with the Lessor as to the Lessee's desired means of ingress and egress to the drill site(s) from public right of way, and such means of access shall be subject to Lessor's prior approval, which approval shall not be unreasonably withheld. Lessee's agents, employees and contractors shall thereafter be limited to ingress and egress to the drill site by way of such approved means of access. The approval by Lessor of the location of any means of access shall not constitute a waiver of compensation for use of the property within the means of access.

    3.2  <u>Roadways to be Constructed</u>
         Any roadway to be constructed from public right of way to any drill site on the leased land shall be constructed in a fashion and of such materials as to support the equipment traversing such means of access, and to avoid any damages to the surrounding surface area of the leased lands. Roadbeds to be constructed with a minimum of a 6" gravel base. Cattle guards and gates will be installed on constructed roadways at entry to leased lands.

4.  <u>Pipelines</u>

    4.1  <u>Method of Installation</u>
         All pipelines installed upon the leased land shall be buried to a depth of at least 40 inches, and shall be installed utilizing a double ditching method such that the top soil removed during excavation is re-installed as the final layer when the pipeline is installed.

5.  <u>Utility Installations</u>
    All utility lines required for the operation of any well shall be installed within the area approved by the Lessor for the construction of the means of access to the well site.

6.  <u>Shut-In-Wells</u>
    Notwithstanding any contrary provision of the Lease, no shut-in well shall be deemed to be a well upon the leased land producing gas in paying quantities for more than three (3) consecutive years from the date the well is shut-in. Further, notwithstanding the provisions of the Lease, the

Doc# 20087621

annual royalty which shall be paid for a shut-in well shall be equal to $5.00 per net mineral acre for acreage covered by the Lease.

7. <u>Use of Water</u>
Notwithstanding any contrary provision of the Lease, the Lessee shall have no right to use of any surface water on the leased land; any water from Lessor's existing wells; or to drill water wells on the leased land without written consent of Lessor and said consent will not be unreasonably withheld.

8. <u>Operations on Leased Land</u>

8.1 <u>Fencing on Well Site</u>
The Lessee shall build and maintain fencing around the well site and all adjacent areas utilized by the Lessee in connection with any production operations.

8.2 <u>Damages</u>
Lessee shall repair, as nearly as practicable, all damages of any kind or character to the leased lands and improvements thereon which might be caused by the Lessee, its agents, servants, employees, sub-contractors, successors and assigns, and Lessee shall pay all damages resulting from operations under the Lease, including, without limitation, damages to any personal property, improvements, livestock, pastures, fences and fencing, ditches, roadways, and crops upon the leased land. For purposes hereof, trees shall be deemed growing crops.

8.3 <u>Restoration of Surface</u>
Whenever practical, Lessee will restore the surface of the lease lands after completion of each well to substantially the same condition as existed prior to commencement of operations upon the leased lands.

8.4 <u>Environmental Matters</u>
Lessee shall use the highest degree of care and all reasonable safeguards to prevent, the contamination or pollution of the soil, sub-soil, surface waters, groundwater, sediment, surface and sub-surface strata, ambient air, or any other environmental medium in, on, or under the leased lands, or any adjacent lands, whether or not owned by the Lessor, by any waste, pollutant or contaminant.  Lessee shall not bring, discharge, or permit to remain, on the leased lands, any explosives, toxic materials or substances regulated as hazardous wastes, substances or materials or toxic substances or materials under any Federal, State or Local law, regulation or order (collectively, "Hazardous Materials"), except those products, in those quantities, normally utilized in connection with oil and gas exploration and production activities.  Lessee shall clean up, remove, remedy and repair any release or contamination to the leased lands by Hazardous Materials caused by its operations upon the leased lands, or any adjoining lands, and shall indemnify and save the Lessor harmless of and from any and all liability, cost, expense or claim of any nature or kind whatsoever, arising out of the release or discharge of any such Hazardous Materials.  The provisions of the Section shall survive the termination or expiration of the Lease.

8.5 <u>Insurance and Indemnity</u>
The Lessee shall indemnify and hold the Lessor, the Lessor's heirs,successors, personal representatives and assigns, harmless of and from all claims and suits for damages arising out of the Lessee's operations or entry upon the leased lands, including, without limitation, claims for damages arising out of personal injury or death to any person,

Doc# 20087621

property damage, including environmental damages, and all other claims or damages, including exemplary damages, of any nature or kind whatsoever, this indemnity to include any attorney's fees or other costs or expenses reasonably incurred by the Lessor in defending or investigating any such claim or action.

8.6   Lack of Drilling Equipment
This lease cannot be extended for lack of drilling equipment.

8.7   Drilling Limitation
No well to be drilled on leased premises within 300 feet of any house or structure located on the said premises as of the date of this lease without the written consent of the Lessor.

## THE BODY OF THE ATTACHED OIL AND GAS LEASE IS HEREBY AMENDED AS FOLLOWS:

Paragraph 3. is hereby amended to read as follows:

To pay Lessor for gas of whatsoever nature or kind (with all of its constituents), including but not limited to casinghead gas, coal seam gas, coal bed methane, and all other gaseous or vaporous substances, produced and sold or used off the lease premises or used in the manufacture of products therefrom, **1/5** of the gross proceeds for the gas sold, used off the premises, or in the manufacture of products therefrom, but in no event more than **1/5** of the actual amount received by the Lessee, said payments to be made monthly. Also, to pay Lessor **1/5** of the gross proceeds for any chemicals, chemical compounds or elements associated with brine production which may be sold or used off the premises, but in no event more than **1/5** of the actual amount received by the Lessee, said payments to be made monthly.

Signed for Identification: _____
Dan Larry Pennington, aka Larry Pennington

Signed for Identification: _____
Freida M. Pennington

Record & Return to:
Chesapeake Operating, Inc.
P.O. Box 18496
Oklahoma City, OK  73154

# EXHIBIT 4

Prepared by:
Chesapeake Energy Corporation
6100 N. Western Avenue
Oklahoma City, Oklahoma 73118

# OIL AND GAS LEASE
## (Paid-up Lease—No Delay Rentals)

L 0 5 3 6 6 9 0

THIS AGREEMENT, made and entered into this 30ᵗʰ day of March, 2010 by and between Richard J. Bryant and Norma J. Bryant, husband and wife of 5832 Highway 9, Center Ridge, AR 72027 hereinafter called lessor (whether one or more), and Chesapeake Exploration, L.L.C., P.O. BOX 18496, Oklahoma City, OK 73154, hereinafter called Lessee.

WITNESSETH Lessor, for and in consideration of _____ TEN AND MORE _____ Dollars ($10.00) and other good and valuable consideration in hand paid, receipt of which is hereby acknowledged, and of the agreements of lessee hereinafter set forth, hereby grants, demises, leases and lets exclusively unto said lessee the lands hereinafter described for the purpose of prospecting, exploring by geophysical and other methods, drilling, mining, operating for and producing oil or gas, or both, including, but not as a limitation, casinghead gas, casinghead gasoline, gas condensate (distillate) and any substance, whether similar or dissimilar, produced in a gaseous state, together with the right to construct and maintain pipe lines, telephone and electric lines, tanks, power stations, ponds, roadways, plants, equipment, and structures thereon to produce, save and take care of said oil and gas, and the exclusive right to inject air, gas, water, brine and other fluids from any source into the subsurface strata and any and all other rights and privileges necessary, incident to, or convenient for the economical operation of said land, alone or conjointly with neighboring land, for the production, saving and taking care of oil and gas and the injection of air, gas, water, brine and other fluids into the subsurface strata, said lands being situated in the Counties of Conway , State of Arkansas, and being described as follows, to-wit:

SEE EXHIBIT "A" FOR LEASE ADDENDUMS
SEE EXHIBIT "B" FOR COMPLETE LEGAL DESCRIPTION

of Section 35 , Township 9N , Range 15W . For all purposes of this lease, said lands shall be deemed to contain 17.15 acres in Conway County, Arkansas.

Subject to the other provisions herein contained, this lease shall remain in force for a term of 5 years from this date (herein called "primary term") and as long thereafter as oil and gas, or either of them is produced from the above described land or drilling operations are continuously prosecuted as hereafter provided. "Drilling operations" includes operations for the drilling of a new well, the reworking, deepening or plugging back of a well or hole or other operations conducted in an effort to obtain or re-establish production of oil or gas, and drilling operations shall be considered to be "continuously prosecuted" if not more than 180 days shall elapse between the completion or abandonment of one well or hole and the commencement of drilling operations on another well or hole. If, at the expiration of the primary term of this lease, oil or gas is not being produced from the above described land but lessee is then engaged in drilling operations, this lease shall continue in force so long as drilling operations are continuously prosecuted, and if production of oil or gas results from any such drilling operations, this lease shall continue in force so long as oil or gas shall be produced. If, after the expiration of the primary term of this lease, production from the above described land should cease, this lease shall not terminate if

C.  To pay Lessor for gas and oil of whatsoever nature or kind (with all of its constituents), including but not limited to casinghead gas, coal seam gas, coal bed methane, oil, and all other gaseous or vaporous substances, and all pooling and commingling production, products sold or used off the lease premises or used in the manufacture of products therefrom, twenty percent (20%) of the gross proceeds, with no production or transportation fees deducted, for the gas and oil sold, used off th premises, or in the manufacture of products therefrom, said payments to be made monthly.

D.  Lessee shall not deduct any costs or expenses from such gross proceeds except Lessor's pro rata share of any severance taxes that may become payable out of Lessor's share of gross production; and

E.  That all royalties, shut-in royalties, or other sums which may become payable to Lessor under the terms of this Lease may be paid or tendered by cash, check, electronic funds transfer, or any other commercially reasonable method which Lessee may elect.

2.      If a well capable of producing gas or gas-condensate in paying quantities located on the leased premises (or on acreage pooled or consolidated with all or a portion of the leased premises, into a unit for the drilling or operation of such well) is at any time shut in and no gas or gas-condensate therefrom is sold or used off the premises or for the manufacture of gasoline or other products, nevertheless such shut-in well shall be deemed to be a well on the leased premises producing gas in paying quantities and this lease will continue in force during all of the time or times while such well is so shut in, whether before or after the expiration of the primary term hereof. Lessee shall use reasonable diligence to market gas or gas-condensate capable of being produced from such shut-in well but shall be under no obligation to market such products under terms, conditions or circumstances which, in lessee's judgment exercised in good faith, as unsatisfactory. Lessee shall be obligated to pay or tender to lessor within 45 days after the expiration of each period of one year in length (annual period) during which such well is so shut in, as royalty, an amount equal to $1.00 per acre for the acreage covered by this lease as to which the leasehold rights are, at the end of such annual period, owned by the lessee making such payment, provided that, if lessor owns less than the full and entire royalty interest in such acreage, such payments shall be such part (calculated on a royalty-acre basis) of said amount as lessor's royalty interest bears to the full and entire royalty interest in such acreage, and provided further that, if gas or gas-condensate from such well is sold or used as aforesaid before the end of any such annual period, or if, at the end of any such annual period, this lease is being maintained in force and effect otherwise than by reason of such shut-in well, lessee shall not be obligated to pay or tender, for that particular annual period, said sum of money. Such payment shall be deemed a royalty under all provisions of this lease. Such payment SHALL BE MADE DIRECTLY TO LESSOR. Royalty ownership as of the last day of each such annual period as shown by lessee's records shall govern the determination of the party or parties entitled to receive such payment.

3.      If lessor owns a less interest in the land covered by this lease than the entire and undivided fee simple mineral estate therein, then whether or not such less interest is referred to or described herein, all royalties herein provided shall be paid lessor only in the proportion (calculated on a royalty-acre basis) which the royalty interest owned by him in said land bears to the full and entire royalty interest in said land.

4.      If the estate of either party hereto is assigned or sublet, and the privilege of assigning or subletting in whole or in part is expressly allowed, the express and implied covenants hereof shall extend to the sublessees successors and assigns of the parties, and in the event of an assignment or subletting by lessee, lessee shall be relieved and discharged as to the leasehold rights so assigned or sublet from any liability to lessor thereafter accruing upon any of the covenants or conditions of this lease, either express or implied. No change in the ownership of the land or royalties, however accomplished, shall operate to enlarge the obligations or diminish the rights of lessee or require separate measuring or installation of separate tanks by lessee. Notwithstanding any actual or constructive knowledge of or notice to lessee, no change in the ownership of said land or of the right to receive royalties hereunder, or of any interest therein, whether by reason of death, conveyance or any other matter, shall be binding on lessee (except at lessee's option in any particular case) until 90 days after lessee has been furnished written notice thereof, and the supporting information hereinafter referred to, by the party claiming as a result of such change in ownership or interest. Such notice shall be supported by original or certified copies of all documents and other instruments or proceedings necessary in lessee's opinion to establish the ownership of the claiming party.

5.      Lessee may, at any time, execute and deliver to lessor or place of record a release covering all or any part of the acreage embraced in the leased premises or covering any one or more zones, formations or depths underlying all or any part of such acreage, and thereupon shall be relieved of all obligations thereafter to accrue with respect to the acreage, zones, formations or depths covered by such release.

6.      Lessee is granted the right, from time to time while this lease is in force, to pool into a separate drilling operating unit or units all or any part of the land covered by this lease with other land, lease or leases, or interests therein (whether such other interests are pooled by a voluntary agreement on the part of the owners therefore by the exercise of a right to pool by the lessees thereof), when in lessee's judgment it is necessary or advisable in order to promote conservation, to properly develop or operate the land and interest to be pooled, or to obtain a multiple production allowable from any government agency having control over such matters. Moreover, if any governmental regulation or order shall permit or prescribe a spacing pattern for the development of a field wherein the above described land, or a portion thereof, is located, or allocate a producing allowable based on acreage per well, then any such unit may embrace such additional or lesser amount of acreage as may be so permitted or prescribed or as may be permitted such allocation of allowable. In lieu of the royalties elsewhere herein specified, except shut-in gas well royalties, lessor shall receive on production from an area so pooled only such portion of the royalties which, in the absence of such pooling, would be payable hereunder to lessor on production from the land covered by this lease which is placed in the pooled area as the amount of the surface acreage in the land covered by this lease which is placed in the pooled areas bears to the amount of the surface acreage of the entire pooled area. Nothing herein contained shall authorize or affect any transfer of any title to any leasehold, royalty or other interest pooled pursuant hereto. The commencement of well, the


663

conduct of other drilling operations, the completion of a well or of a dry hole, or the operation of a producing well on the pooled area, shall be considered for all purposes (except for royalty purposes) the same as if said well were located upon, or such drilling operations were conducted upon the lands covered by this lease whether or not such well is located upon, or such drilling operations are conducted upon, said lands.  Lessee may terminate any pooling effected pursuant hereto at any time the pooled unit is not producing and no drilling operations are being conducted thereupon by executing and filing of record in the county or counties in which the pooled area is located a written declaration of the termination of such pooling, provided that the pooling of all interests not covered by this lease which comprise a part of such pooled unit be also terminated in some effective manner.

7.    When required by the Lessor, the Lessee shall bury its pipelines below plow depth and shall pay fair market value for damage by reason of its operations on said land.  No well shall be drilled or other drilling activity shall occur nearer than 500 feet to any house or barn or other structure on said premises as of the date of this Lease without the written consent of the Lessor.  Lessee shall have the right at any time during, or after the expiration of this Lease to enter upon the property and to remove all machinery, fixtures, and other structures placed on said premises, including the right to draw and remove all casing, but the Lessee shall be under no obligation to do so.

8.    Lessees shall have obligation to confirm title.  Lessor does not warrant title, but shall have responsibility to assist in curing defect in title if requested by Lessee.  Lessee may purchase or lease the rights of any party claiming any interest in said land and exercise such rights as may be obtained thereby but lessee shall not suffer any forfeiture nor incur any liability to lessor by reason thereof.  Lessee shall have the right at any time to pay for lessor, any mortgage, taxes or other lien on said lands, in the event of default of payment of lessor, and be subrogated to the rights of the holder thereof, and any such payments made by lessee for lessor may be deducted from any amounts of money which may become due lessor under this lease.

9.    In the event lessor considers that lessee is in breach of any of its obligations hereunder, lessor shall notify lessee in writing of the facts relied upon as constituting a breach hereof, and lessee, if in breach hereof, shall have sixty days after receipt of such notice in which to commence the compliance with the obligations imposed by virtue of this lease.  Until such time as lessee has been given the above-described written notice and opportunity to cure the asserted breach, lessee shall not be considered in default under the terms of this lease.

10.   Should lessee be prevented from complying with any express or implied covenant of this lease, from conducting drilling or reworking operations thereon or from producing oil or gas therefrom by reason of scarcity of or inability to obtain or to use equipment or material, by operation of force majeure, by any Federal or state law or any order, rule or regulation of government authority, or by any other cause beyond the reasonable control of lessee, then while so prevented, lessee's obligation to comply with such covenant shall be suspended, and lessee shall not be liable in damages for failure to comply therewith; and this lease shall be extended while and so long as lessee is so prevented by any such cause from conducting drilling or reworking operations on or from producing oil or gas from the leased premises; and the time while lessee is so prevented shall not be counted against lessee, anything in this lease to the contrary notwithstanding.

11.   This lease and all provisions thereof shall be applicable to, binding upon and enforceable by the parties thereto and their respective successors and assigns.  Reference herein to lessor and lessee shall include reference to their respective successors and assigns, it being expressly agreed that lessor and lessee shall have the right to assign.  Should any one or more of the parties named above as lessors not execute this lease, it shall nevertheless be binding upon the party or parties executing the same.

12.   Each wife/husband above named hereby joins in the execution and delivery of this lease for the purpose of conveying, releasing and relinquishing unto lessee, for the purpose and consideration aforesaid, all of his/her right, title, interest and estate in said land, including any rights of dower/curtesy and homestead which he/she may have therein.

IN WITNESS WHEREOF, this lease is executed as of the day and year first above written.

## Joint Acknowledgment – Arkansas

STATE OF ARKANSAS

COUNTY OF VAN BUREN

On this 30ᵗʰ day of March , 2010 before me the undersigned Notary Public in and for said County and State personally appeared Richard J. Bryant and Norma J. Bryant, husband and wife, known to me to be the persons whose names are subscribed to the foregoing instrument and acknowledged that they executed the same as their free and voluntary act and deed for the purpose and consideration therein mentioned and set forth.

IN WITNESS WHEREOF I have hereunto set my hand and official seal.

NOTARY PUBLIC

MY COMMISSION EXPIRES:

NONA H. HENDERSON
NOTARY PUBLIC-STATE OF ARKANSAS
UNION COUNTY
My Commission Expires 02-01-2014

6665

# Exhibit A - Addendum

ATTACHED TO AND MADE AN ESSENTIAL PART OF THE CERTAIN OIL & GAS LEASE entered into on the 30th day of March, 2010, by and between Richard J. Bryant and Norma J. Bryant, husband and wife ("Lessor") and Chesapeake Exploration, L.L.C. ("Lessee"). It is the purpose and intent of this Addendum to control the provisions of said Oil & Gas Lease and to the extent the terms and provisions of this Addendum conflict with the provisions of said Oil & Gas Lease, the terms and provisions of this Addendum shall be paramount and controlling as to any conflict notwithstanding anything to the contrary in said Oil & Gas Lease.

1.    Upon the expiration of the primary term, drilling or reworking operations on and the production of oil or gas from a pooled oil unit or a pooled gas unit formed pursuant to the provisions of this Lease will maintain this Lease only as to that portion of the leased premises located within the pooled unit from which production is being obtained.

2.    If a well is shut-in as described in paragraph 2 of the Lease, Lessee shall be obligated to pay or tender to Lessor within 45 days after the expiration of each period of one year in length (annual period) during which such well is so shut-in, as royalty, an amount equal to ten dollars ($10.00) per acre for each well so shut-in. Upon the expiration of the primary term, this Lease shall not be continued in force solely under the provisions of the shut-in royalty clause for any continuous period more than three (3) years.

3.    Lessee agrees to pay Lessor market value for surface damages, whether pipelines, well pads, right of way or easement or any damage caused by its operations including damages to growing crops, timber, and improvements on the lease premises.

4.    Lessee shall not have the right at any time to use fresh water from or located in any well, pond, irrigation ditch, tank, lake, or reservoir located on the lands without the prior written consent of Lessor.

5.    The Lessee shall indemnify and hold the Lessor, the Lessor's heirs, successors, personal representatives and assigns, harmless of and from all claims and suits for damages arising out of the Lessee's operations or entry upon the leased lands, including, without limitation, claims for damages arising out of personal injury or death to any person, property damage, including environmental damages, and all other claims or damages, including exemplary damages, of any nature of kind whatsoever, this indemnity to include any attorney's fees and other costs or expenses reasonably incurred by the Lessor in defending or investigating any such claim or action.

6.    Upon cessation of production, the leased premises shall be restored as near as practicable to the condition it was in before any operations were commenced by Lessee.

7.    Lessee, its assigns, contractors, and subcontractors agree to comply with all applicable rules and regulations of the Arkansas Oil & Gas Commission and the Arkansas Department of Environmental Quality with respect to the leased premises.

8.    All pipelines shall be buried and maintained at least thirty-six (36) inches deep so farming and ranching operations may be safely performed.

9.    This lease can not be extended for lack of drilling equipment.

10.    Within 180 days after the termination of Lessee's operations on the leased premises, Lessee shall remove all machinery, fixtures, and other structures placed on the surface of the leased premises by Lessee. If Lessee does not remove said structures within 240 days after termination of Lessee's operations, Lessor may cause such property to be removed at Lessee's expense. Notwithstanding the foregoing, after cessation of Lessee's use of any water well which may be drilled by Lessee on the leased premises, and prior to plugging or removing the casing of any such water well, Lessee shall tender such water well to the Lessor; and if the Lessor elects in a timely manner to accept same, such water well shall be and become the property of the Lessor.

## Exhibit B

**ATTACHED TO AND MADE AN ESSENTIAL PART OF THE CERTAIN OIL & GAS LEASE** entered into on the 30th day of March, 2010, by and between Richard J. Bryant and Norma J. Bryant, husband and wife, ("Lessor") and Chesapeake Exploration, L.L.C. ("Lessee").

### Legal Description

PART OF THE SE 1/4 NW 1/4 AND PART OF THE SW 1/4 NE 1/4 DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHWEST CORNER OF THE SW 1/4 NE 1/4 AND RUNNING THENCE NORTH 393.76 FEET; THENCE WEST 252.10 TO A POINT ON THE EAST BOUNDARY OF ARKANSAS STATE HIGHWAY #9; THENCE NORTH 24 DEGREES 10 MINUTES EAST ALONG HIGHWAY RIGHT OF WAY 201.40 FEET TO POINT OF BEGINNING; THENCE EAST 220 FEET; THENCE NORTH 50 FEET; THENCE IN A WESTERLY DIRECTION 200 FEET TO A POINT ON EAST RIGHT OF WAY LINE OF ARKANSAS STATE HIGHWAY #9, THENCE SOUTH 24 DEGREES 10 MINUTES WEST ALONG EAST SIDE OF SAID HIGHWAY 72.5 FEET TO THE POINT OF BEGINNING, CONTAINING .27 ACRES. MORE OR LESS.

AND

PART OF THE SE 1/4 NE 1/4 AND PART OF THE SW 1/4 NE 1/4 DESCRIBED AS COMMENCING AT THE SOUTHWEST CORNER OF THE SW 1/4 NE 1/4 AND RUNNING THENCE NORTH 24 DEGREES 10 MINUTES EAST 201.40 FEET TO A POINT WHICH IS 577.50 FEET NORTH OF THE SOUTH LINE OF THE SW 1/4 NE 1/4; THENCE WEST 802.10 FEET TO EAST RIGHT OF WAY LINE OF STATE HIGHWAY #9; THENCE SOUTH 24 DEGREES 10 MINUTES WEST ALONG SAID RIGHT OF WAY LINE 201.40 FEET; THENCE EAST 252.10 FEET TO THE POINT OF BEGINNING CONTAINING 3.38 ACRES, MORE OR LESS.

AND

PART OF THE SW 1/4 NE 1/4 DESCRIBED AS COMMENCING AT THE SOUTHEAST CORNER OF SW 1/4 NE 1/4 AND RUNNING THENCE NORTH 368.50 FEET TO THE POINT OF BEGINNING, THENCE WEST 779.40 FEET, THENCE NORTH 24 DEGREES 10 MINUTES EAST 229 FEET; THENCE EAST 685.60 FEET; THENCE SOUTH 209 FEET TO THE POINT OF BEGINNING, CONTAINING 3.50 ACRES, MORE OR LESS.

AND

PART OF THE SW 1/4 NE 1/4 AND PART OF THE SE 1/4 NW 1/4 DESCRIBED AS COMMENCING AT THE SOUTHWEST CORNER OF THE SW 1/4 NE 1/4 AND RUNNING NORTH 209.88 FEET TO POINT OF BEGINNING; THENCE EAST 376.08 FEET; THENCE NORTH 24 DEGREES 10 MINUTES EAST 201.54 FEET; THENCE WEST 710.68 FEET TO THE EAST RIGHT OF WAY LINE OF STATE HIGHWAY #9; THENCE ALONG SAID EAST RIGHT OF WAY LINE SOUTH 24 DEGREES 10 MINUTES WEST 201.54 FEET; THENCE EAST 334.60 FEET TO THE POINT OF BEGINNING, CONTAINING 3 ACRES, MORE OR LESS.

AND

A TRACT OF LAND MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING IN COUNTY ROAD AT THE SOUTHEAST CORNER OF THE SW 1/4 NE 1/4; THENCE ALONG COUNTY ROAD WEST 250 FEET; THENCE NORTH 191.66 FEET; THENCE WEST 200 FEET; THENCE SOUTH 191.66 FEET; THENCE WEST 334.70 FEET TO THE SOUTHEAST CORNER OF THE ERNIE RHOADS PROPERTY; THENCE NORTH 5 DEGREES 35 MINUTES WEST 238 FEET; THENCE SOUTH 85 DEGREES 58 MINUTES WEST 107.50 FEET; THENCE SOUTH 6 DEGREES 19 MINUTES EAST 230.70 FEET TO THE SOUTH LINE OF SW 1/4 NE 1/4; THENCE ALONG COUNTY ROAD WEST 164.70 FEET; THENCE ALONG EAST CEMETERY FENCE NORTH 3 DEGREES 30 MINUTES WEST 200 FEET TO FENCE CORNER; THENCE NORTH 85 DEGREES 35 MINUTES EAST 126.40 FEET TO AN IRON ROD, THENCE NORTH 24 DEGREES 10 MINUTES EAST 201.54 FEET TO AN IRON ROD; THENCE EAST 91.42 FEET TO AN IRON ROD; THENCE SOUTH 24 DEGREES 10 MINUTES WEST 27.6 FEET TO AN IRON ROD; THENCE EAST 779.40 FEET TO AN IRON ROD ON EAST LINE OF SW 1/4 NE 1/4; THENCE SOUTH 368.5 FEET TO POINT OF BEGINNING, CONTAINING 7 ACRES, MORE OR LESS.

ALL LOCATED IN SECTION 35, TOWNSHIP 9 NORTH, RANGE 15 WEST, CONWAY COUNTY, AR.

cord & Return to:
sapeake Operating, Inc.
). Box 18496
lahoma City, OK 73154

# EXHIBIT 5

Producers Form 88-640 Paxing-AR-Paid-up-CHK-Rev 2006

Prepared by:
Chesapeake Energy Corporation
6100 N. Western Avenue
Oklahoma City, Oklahoma 73118

CERTIFICATE OF RECORD
Doc# 200710437
Page #1
Date 10/15/2007
10:19:57 AM
Filed & Recorded in
Official Records of
STATE OF ARKANSAS
VAN BUREN COUNTY
ESTER BASS
CIRCUIT/COUNTY CLERK
Fees $35.00
BY: _____

# Oil and Gas Lease
## (Paid-Up)

L 0 1 4 8 6 5 4

**This Agreement** made and entered into this **8th** day of **August, 2007** by and between **Ralph Parish and Reba Parish, tenants by the entirety,** 13648 Highway 65 South, Damascus, Arkansas 72039, hereinafter called Lessor, and **Chesapeake Exploration, L.L.C.,** P.O. Box 18496, Oklahoma City, Oklahoma 73154-0496, hereinafter called Lessee.

**Know All Men By These Presents:**

1. That Lessor, for and in consideration of the sum of ten dollars ($10.00) in-hand paid, and of the covenants and agreements hereinafter contained to be performed by the Lessee, does hereby grant, demise, lease and let unto said Lessee exclusively the hereinafter described land, for the purpose of carrying on geological, geophysical, seismic, and other exploration work, and drilling and operating for, producing and saving all of the oil, gas, (including casinghead gas, coal seam gas, coal bed methane gas, helium and all other constituents) and other hydrocarbons, all that certain tract of land, together with any reversionary rights therein, situated in the County of **Van Buren**, State of Arkansas, and described as follows:

**See Attached Exhibit "A" for a detailed description of lands covered by this lease.**

Containing **5.60** acres, more or less, and also, in addition to the above described land, any and all strips or parcels of land, other than those constituting regular governmental subdivisions, adjoining or contiguous to the above described land and owned or claimed by Lessor, all of the foregoing land being hereinafter referred to as leased premises. *It is the intent of the Lessor herein that the leased premises cover and include all lands owned or claimed by Lessor in the above numbered governmental section(s), together with any and all accretions thereto, whether or not herein accurately and completely described.*

2. This lease shall remain in force for a primary term of **18 months**, and as long thereafter as oil, gas or other hydrocarbons are produced from said leased premises or from lands pooled therewith.

3. Lessee shall deliver, free of cost, to Lessor at the wells, or to the credit of Lessor in the pipeline to which the wells may be connected, the equal **3/16ths** part of all oil and other liquid hydrocarbons produced and saved from the leased premises, or at Lessee's option, to pay Lessor for such **3/16ths** royalty the market price at the well for such oil and other liquid hydrocarbons of like grade and gravity prevailing on the day such oil and other liquid hydrocarbons are run from the lease stock tanks.

4. Lessee shall pay, or if required by law, contribute to be paid to Lessor a royalty of **3/16ths** of the proceeds realized by Lessee from the sale of all gas, including all substances contained in such gas, but in no event more or less than the actual amount received by Lessee, less applicable taxes, said payments to be made monthly. If such gas is used by Lessee off the leased premises or used by Lessee for the manufacture of casinghead gasoline or other products, Lessee shall pay Lessor **3/16ths** of the market value at the well for gas so used.

5. If a well capable of producing gas or gas and gas condensate in paying quantities located on the leased premises (or on acreage pooled or consolidated with all or a portion of the leased premises into a unit for the drilling or operation of such well) is at any time shut in and no gas or gas condensate therefrom is sold or used off the premises or for the manufacture of gasoline or other products, nevertheless such shut-in well shall be deemed to be a well on the leased

A R 3 1 3 4 2 2 5 - 2 0 1

MMGJ208829

Doc# 200710437

Producers Form 88-640 Pooling-AR-Paid-up-CHK-Rev 2006

premises producing gas in paying quantities and this lease will continue in force during all of the time or times while such well is so shut in, whether before or after the expiration of the primary term hereof. Lessee shall use reasonable diligence to market gas or gas condensate capable of being produced from such shut-in well but shall be under no obligation to market such products under terms, conditions or circumstances which, in Lessee's judgment exercised in good faith, are unsatisfactory. Lessee shall be obligated to pay or tender to Lessor within forty-five (45) days after the expiration of each period of one year in length (annual period) during which such well is so shut in, a royalty of One Dollar ($1.00) per net mineral acre retained hereunder as of the end of such annual period; provided that if gas or gas condensate from such well is sold or used as aforesaid before the end of any such annual period, or if at the end of any such annual period, this lease is being maintained in force and effect otherwise than by reason of such shut-in well, Lessee shall not be obligated to pay or tender, for that particular annual period, said sum of money. Such payment shall be deemed a royalty under all provisions of this lease. Lessee's failure to pay or tender such payment, for any reason, shall render Lessee liable for the amount due, but shall not operate to terminate this lease. Such payment shall be made or tendered to Lessor at the above address or to their successors. Royalty ownership as of the last day of each such annual period as shown by Lessee's records shall govern the determination of the party or parties entitled to receive such payment.

6.  Lessee hereby is given the right at its option, at any time and whether before or after production, to pool for development and operation purposes all or any part or parts of the leased premises or rights therein with any other land in the vicinity thereof, or with any leasehold, operating or other rights or interests in such other land so as to create units of such size and surface acreage as Lessee may desire, but containing not more than one hundred sixty (160) acres; provided, however, a unit may be established hereunder containing not more than six hundred forty (640) acres plus 10% acreage tolerance if unitized only as to gas rights or only as to gas condensate, except that units pooled for oil or oil and gas for or in conjunction with re-pressuring, pressure maintenance, cycling, and secondary recovery operations or any one or more of same, may be formed to include not more than three hundred twenty (320) acres. If at any time larger units are required under any then applicable law, rule, regulations, or order of any governmental authority for the drilling, completion or operation of a well, or for obtaining maximum allowable from any contemplated, drilling, or completed well, any such unit may be established or enlarged to conform to the size specified by such law, rule, regulation, or order.

Operations on any part of any lands so pooled shall, except for the payment of royalties, be considered operations on the leased premises under this lease, and notwithstanding the status of a well at the time of pooling, such operations shall be deemed to be in connection with a well which was commenced on leased premises under this lease. The term "operations" as used herein shall include, without limitation, the following:  commencing construction of roadways, preparation of drillsite, drilling, testing, completing, reworking, recompleting, deepening, plugging back, re-pressuring pressure maintenance, cycling, secondary recovery operations, or the production of oil or gas, or the existence of a shut-in well capable of producing oil or gas.

There shall be allocated to the portion of the leased premises included in any such pooling such proportion of the actual production from all lands so pooled as such portion of leased premises, computed on an acreage basis, bears to the entire acreage of the lands so pooled. The production so allocated shall be considered for the purpose of payment or delivery of royalty to be the entire production for the portion of leased premises included in such pooling in the same manner as though produced from such portion of leased premises under the terms of this Lease.

7.  If the Lessor owns a lesser interest in the above-described land than the entire and undivided mineral estate therein, then the royalties provided for herein shall be paid to said Lessor only in the proportion which his interest bears to the whole and undivided mineral estate.

8.  If the estate of either party hereto is assigned, and the privilege of assigning in whole or in part is hereby expressly allowed, the covenants hereof shall extend to their heirs, executors, administrators, successors or assigns, but no change in the ownership of the leased premises or the minerals in and under the same or assignment of royalties shall be binding on Lessee unless Lessee shall have been furnished ninety (90) days before payment hereunder of such royalties with certified copies of recorded instruments showing evidence of title.

9.  Lessee shall have the right to use, free of cost, gas, oil and water found on said land for its operations, except water from the wells of Lessor. When required by Lessor, Lessee shall bury its pipeline below plow depth and shall pay reasonable damages for injury by reason of its operations to growing crops on said land. No well shall be drilled nearer than two hundred (200) feet to any house or other permanent structure occupied by humans or livestock on the leased premises as of the date of this lease without the written consent of the Lessor. Lessee shall have the right at any time

Doc# 200710437

Producers Form 88-640 Pooling-AR-Paid-up-CHK-Rev 2006

during or after the expiration of this lease to enter upon the property and to remove all machinery, fixtures, and other structures placed on said premises, including the right to draw and remove all casing, but the Lessee shall be under no obligation to do so.

10. Notwithstanding anything contained in this lease to the contrary, it is expressly agreed that if the Lessee shall commence operations as provided herein at any time while this lease is in force, this Lease shall remain in force and its terms shall continue so long as such operations are prosecuted, and if production results therefrom, then as long as production is maintained.

11. If after the expiration of the primary term of this Lease production on the leased premises should cease from any cause, this lease shall not terminate, provided, Lessee commences operations for additional drilling or reworking within ninety (90) days from such cessation, and this lease shall remain in force during the prosecution of such operations and if production results therefrom, then as long as production is maintained.

12. Lessee may at any time surrender or cancel this lease in whole or in part by delivering or mailing such release to the Lessor, or by placing such release of record in the proper county. In case this Lease is surrendered or cancelled as to only a portion of the acreage covered thereby, then all payments and liabilities thereafter accruing under the terms of this lease as to the portion cancelled shall cease. As to the portion of the acreage not released, the terms and provisions of this lease shall continue and remain in full force and effect for all purposes.

13. All provisions hereof, express or implied, shall be subject to all federal and state laws and the orders, rules and regulations of all governmental agencies administering the same. This lease shall not in any way be terminated wholly or partially, nor shall the Lessee be liable in damages for failure to comply with any of the express or implied provisions hereof if such failure is the result of the exercise of such governmental authority, acts of God, explosion, blow out, fire, flood, lack of market, market conditions, lack of equipment for any cause, equipment failure, labor trouble, war or any other cause reasonably beyond the control of the Lessee. Should the Lessee be prevented during the last year of the primary term hereof from complying with any of the express or implied provisions hereof or its obligations hereunder by any of the aforestated causes, the primary term of this lease shall be extended until one year after the removal of such cause(s).

14. Lessor hereby warrants and agrees to defend title to the land herein described and agrees that the Lessee, at its option, may pay or discharge in whole or in part any taxes, encumbrances, or other liens existing, levied or assessed against the leased premises, and in the event Lessee exercises such option, it shall be subrogated to the rights of any holders thereof and may reimburse itself by applying any royalty accruing hereunder to the amount of any such encumbrance, tax or other lien paid by Lessee plus any costs, expenses, or attorney fees reasonably incurred by Lessee and interest at the rate of ten percent (10%) per annum. To facilitate Lessee's proper payment hereunder, it is specifically understood and agreed that Lessee will require Lessor to execute and return Lessee's then current form of division order or other payment directive as a condition precedent to Lessee's obligation to pay royalties from production hereunder.

15. Lessee hereby is given the right to acquire for its own benefit, deeds, leases, or assignments covering any interest or claim in the leased premises which Lessee, or any other party contends is outstanding and not covered hereby, even though such outstanding interest or claim may be invalid or adverse to Lessor. In the event the validity of this lease, or Lessee's privilege to exercise its right hereunder, be disputed by Lessor or by any other person, then, for the period such dispute remains undisposed of, Lessee shall be relieved of all obligations hereunder to explore or develop leased premises, all royalties or other payments which would otherwise accrue shall be suspended for such period, and this lease shall be automatically extended for an additional period equal to the duration of such period.

16. If at any time within the primary term of this lease or during the time this lease is in effect, Lessor receives any bona fide offer acceptable to Lessor, to grant an additional lease (top lease) covering all or any part of the aforescribed lands, Lessee shall have the continuing option by meeting any such offer to acquire such top lease. Any offer must be in writing, and must set forth the proposed Lessee's name, including the client name if purchased through an independent broker, bonus consideration and royalty consideration to be paid for such lease, and include a copy of the lease form to be utilized, which form should reflect all pertinent and relevant terms and conditions of the top lease. Lessee, or its assigns, shall have fifteen (15) days after receipt from Lessor of a complete copy of any such offer to advise Lessor in writing of its election to enter into an oil and gas lease with Lessor on equivalent terms and conditions. If Lessee, or its assigns, fails

MMGJ208831

Doc# 200710437

*Producers Form 88-6x10 Pooling-AR-Paid-up-CHK-Rev 2006*

to notify Lessor within the aforesaid fifteen (15) day period of its election to meet any such bona fide offer, Lessor shall have the right to accept said offer.

17. It is specifically understood that each spouse named herein and executing this Lease, for the consideration set out above and the covenants and agreements contained in this lease to be performed by the Lessee, does hereby release and relinquish unto said Lessee, all right of dower, curtesy and homestead in and to the lands covered hereby for the purposes of this lease.

18. This Lease and all its terms, conditions and stipulations shall extend to and be binding upon all successors in title of said Lessor or Lessee.

## See Attached Exhibit "A"

In Testimony Whereof, this lease is executed as of the date first set out hereinabove.

_____
**Ralph Parish**

_____
**Reba Parish**

STATE OF ARKANSAS          }
                          } §:        Acknowledgement for Individual
COUNTY OF FAULKNER         }

Before me, the undersigned, a Notary Public, in and for said County and State, on this *13th* day of *August*, 2007, appeared **Ralph Parish and Reba Parish, tenants by the entirety,** to me known to be the identical person(s) who executed the within and foregoing instrument, and acknowledged to me that he/she executed the same as his/her free and voluntary act and deed, for the uses and purposes therein set forth, including the relinquishment of curtesy, dower and homestead.

IN WITNESS WHEREOF, I have hereunto set my official signature and affixed my official seal and day and year last above written.

My Commission Expires: *Sept 28, 2015*

_____
Notary Public

Anl

Doc# 200710437

Producers Form 88-640 Pooling-AR-Paid-up-CHK-Rev 2006

**Exhibit "A"**

Attached to and made a part of that certain Oil and Gas Lease dated August 8, 2007, between **Ralph Parish and Reba Parish, tenants by the entirety,** Lessor, and **Chesapeake Exploration, L.L.C.,** Lessee.

### Township 9 North, Range 13 West

**Section  32  :** Part SE/4 NE/4 described as beginning at a point 55 feet East and 1593.6 feet South 8 deg 8 min East of the NWC of the E/2 NE/4 of said Section 32, thence continuing South 8 deg 8 min East 847.0 feet to the Westerly right-of-way line of U.S. Highway 65, thence along said right-of-way line North 56 deg 13 min East 275.9 feet, thence continuing along said right-of-way North 55 deg 23 min East 152.2 feet, thence North 16 deg 5 min West 532.8 feet, thence North 74 deg 4 min 20 sec West 345.26 feet to point of beginning, containing 5.6 acres, more or less.

The terms and provision of the Oil and Gas Lease to which this Exhibit "A" is attached shall be amended as follows:

1. Lessor's royalty shall never bear or be charged with, directly or indirectly, any part of the costs or expenses of production, gathering, dehydration, compression, transportation, manufacturing, processing, treating, or marketing of oil and/or gas produced from the leased premises. There shall be no deductions from Lessor's royalty for costs and expenses associated with the construction, operation, or depreciation of any pipeline, gathering system, plant or other facility or equipment for processing and /or treating oil and /or gas or their constituents produced from the leased premises. However, any such costs which result in enhancing the value of the marketable oil, gas or other products to receive a better price may be deducted from Lessor's share of production so long as they are based on Lessee's actual cost of such enhancements. However, in no event shall Lessor receive a price that is less than, or more than, the price received by Lessee.

**End of Exhibit "A"**

Record & Return to:
Chesapeake Operating, Inc.
P.O. Box 18496
Oklahoma City, OK  73154

MMGJ208833

# EXHIBIT 6

023818

Doc#2006- 23554
Date 10/13/2006
01:45:41 PM
Filed & Recorded in
Official Records of    279167
Faulkner County
SHARON RIMMER
FAULKNER COUNTY CIRCUIT CLERK
Fees $23.00
by _____ D.C.

## OIL AND GAS LEASE
(Arkansas — paid up)

This instrument prepared by:
Gary A. Monroe & Associates
P. O. Box 2110
Fort Smith, AR 72902-2110

THIS AGREEMENT made and entered into this **25th** day of **September, 2006**, by and between

**Robbie Thomas and Pamela Thomas, h/w**
**357 Middle Road**
**Conway, AR 72032**

hereinafter called Lessor and *Chesapeake Exploration Limited Partnership*, an Oklahoma limited partnership, P.O. Box 18496, Oklahoma City, Oklahoma 73154-0496, hereinafter called Lessee.

1. That Lessor, for and in consideration of the sum of Ten and more Dollars ($10.00 & more) in hand paid, and of the covenants and agreements hereinafter contained to be performed by the Lessee, does hereby grant, demise. lease and let unto said Lessee exclusively the hereinafter described land, for the purpose of carrying on geological. geophysical. seismic. and other exploration work, and drilling and operating for, producing and saving all of the oil, gas, (including casinghead gas, coal seam gas, coal bed methane gas, helium and all other constituents) and other hydrocarbons, all that certain tract of land, together with any and all reversionary rights therein, situated in the County of **Faulkner**, State of Arkansas, and described as follows:

### See Exhibit "A" attached hereto and made a part hereof for Complete Legal Description.

### See Exhibit "B" attached hereto and made a part hereof for Addendum.

of Sections_____**36**_____, Township_____**8 North**_____, Range _____**12 West**_____, and containing ____**29.51** acres, more or less, and also, in addition to the above described land, any and all strips or parcels of land, other than those constituting regular governmental subdivisions, adjoining or contiguous to the above described land and owned or claimed by Lessor, all of the foregoing land being hereinafter referred to as leased premises. It is the intention of the Lessor herein that the leased premises cover and include all lands owned or claimed by Lessor in the above numbered governmental section or sections together with any and all accretions thereto whether or not herein accurately and completely described.

2. This lease shall remain in force for a primary term of ____**Five (5)**____ years and as long thereafter as oil, gas or other hydrocarbons are produced from said leased premises or from lands pooled therewith.

3. Lessee shall deliver, free of cost, to Lessor at the wells, or to the credit of Lessor in the pipeline to which the wells may be connected, the equal ____**3/16th**____ part of all oil and other liquid hydrocarbons produced and saved from the leased premises, or at Lessee's option, to pay Lessor for such ____**3/16th**____ royalty the market price at the well for such oil and other liquid hydrocarbons of like grade and gravity prevailing on the day such oil and other liquid hydrocarbons are run from the lease stock tanks.

4. Lessee shall pay or, if required by law, contribute to be paid to Lessor ____**3/16th**____ of the net proceeds realized by Lessee for all gas (including all substances contained in such gas) produced from the leased premises and sold by Lessee, less Lessor's proportionate share of taxes and all costs incurred by Lessee in delivering, processing, compressing or otherwise making such gas or other substances merchantable or enhancing the marketing thereof. If such gas is used by Lessee off the leased premises or used by Lessee for the manufacture of casinghead gasoline or other products, Lessee shall pay Lessor ____**3/16th**____ of the prevailing market value at the well for the gas so used.

5. If a well capable of producing gas or gas and gas-condensate in paying quantities located on the leased premises (or on acreage pooled or consolidated with all or a portion of the leased premises into a unit for the drilling or operation of such well) is at any time shut in and no gas or gas-condensate therefrom, is sold or used off the premises or for the manufacture of gasoline or other products, nevertheless such shut-in well shall be deemed to be a well on the leased premises producing gas in paying quantities and this Lease will continue in force during all of the time or times while such shut-in well is so shut in, whether before or after the expiration of the primary term hereof. Lessee shall use reasonable diligence to market gas or gas-condensation capable of being produced from such shut-in well but shall be under no obligation to market such products under terms, conditions or circumstances which, in Lessee's judgement exercised in good faith, are unsatisfactory. Lessee shall be obligated to pay or tender to Lessor within 45 days after the expiration of each period of one year length (annual period) during which such well is so shut in, a royalty of One Dollar ($1.00) per net royalty acre retained hereunder as of the end of such annual period: provided that, if gas or gas-condensate from such well is sold or used as aforesaid before the end of any such annual period, or if, at the end of any such annual period, this Lease is being maintained in force and effect otherwise than by reason of such shut-in well, Lessee shall not be obligated to pay or tender, for that particular annual period, said sum of money. Such payment shall be deemed a royalty under all provisions of this Lease. Lessee's failure to pay or tender such payment, for any reason, shall render Lessee liable for the amount due, but shall not operate to terminate this lease. Such payment shall be made or tendered to Lessor at the above address or to their successors. Royalty ownership as of the last day of each such annual period as shown by Lessee's records shall govern the determination of the party or parties entitled to receive such payment.

6. Lessee hereby is given the right at its option, at any time and whether before or after production, to pool for development and operation purposes all or any part or parts of the leased premises or rights therein with any other land in the vicinity thereof, or with any leasehold, operating or other rights or interests in such other land so as to create units of such size and surface acreage as Lessee may desire but containing not more than forty-five (45) acres; provided, however, a unit may be established hereunder containing not more than 640 acres plus 10% acreage tolerance if unitized only as to gas rights or only as to gas and gas-condensate, except that units pooled for oil or oil and gas for or in conjunction with repressuring, pressure maintenance, cycling and secondary recovery operations or any one or more of same, may be formed to include no more than 320 acres. If at any time larger units are required under any then applicable law, rule, regulations or order of any governmental authority for the drilling, completion or operation of a well, or for obtaining maximum allowable for any contemplated, drilling or completed well, any such unit may be established or enlarged to conform to the size specified by such law, rule, regulation or order.

Operations on any part of any lands so pooled shall, except for the payment of royalties, be considered operations on leased premises under this Lease, and, notwithstanding the status of a well at the time of pooling, such operations shall be deemed to be in connection with a well which is commenced on leased premises under this Lease. The term "operations" as used herein shall include, without limitation, the following: Commencing, construction of roadways, preparation of drillsite, drilling, testing, completing, reworking, recompleting, deepening, plugging back, repressuring, pressuring maintenance, cycling, secondary recovery operations, or the production of oil or gas, or the existence of a shut-in well capable of producing oil or gas.

There shall be allocated to the portion of leased premises included in any such pooling such proportion of the actual production from all lands so pooled as such portion as leased premises, computed on an acreage basis, bears to the entire acreage of the lands so pooled. The production so allocated shall be considered for the purpose of payment or delivery of royalty to be the entire production for the portion of leased premises included in such pooling in the same manner as though produced from such portion of leased premises under the terms of this Lease.

7. If the Lessor owns a lesser interest in the above-described land than the entire and undivided mineral estate therein, then the royalties herein provided for shall be paid the said Lessor only in the proportion which his interest bears the whole and undivided mineral estate.

8. If the estate of either party hereto is assigned, and the privilege of assigning in whole or in part is hereby expressly allowed, the covenants hereof shall extend to their heirs, executors, administrators, successors or assigns, but no change in the ownership of the land or the minerals in and under the same or assignment of royalties shall be binding on Lessee unless Lessee shall have been furnished ninety (90) days before payment hereunder of such royalties, with certified copies of recorded instruments showing evidence of title.

9. Lessee shall have the right to use, free of cost, gas, oil and water found on said land for its operations, except water from the wells of the Lessor. When required by the Lessor, the Lessee shall bury its pipelines below plow depth and shall pay reasonable damages for injury by reason of its operations to growing crops on said land. No well shall be drilled nearer than 200 feet to any house or barn or other structure on said premises as of the date of this Lease without the written consent of the Lessor. Lessee shall have the right at any time during, or after the expiration of this Lease to enter upon the property and to remove all machinery, fixtures, and other structures placed on said premises, including the right to draw and move all casing, but the Lessee shall be under no obligation to do so.

10. Notwithstanding anything contained in this Lease to the contrary, it is expressly agreed that if the Lessee shall commence operations as provided herein at any time while this Lease is in force, this Lease shall remain in force and its terms shall continue so long as such operations are prosecuted, and if production results therefrom, then as long as production is maintained.

11. If, after the expiration of the primary term of this Lease, production on the leased premises should cease from any cause, this Lease shall not terminate provided Lessee commences operations for additional drilling or reworking within sixty (60) days from such cessation, and this Lease shall remain in force during the prosecution of such operations and if production results therefrom, then as long as production is maintained.

12. Lessee may at any time surrender or cancel this Lease in whole or in part by delivering or mailing such release to the Lessor, or by placing such release of record in the proper County. In case this Lease is surrendered or cancelled as to only a portion of the acreage covered thereby, then all payments and liabilities thereafter accruing under the terms of this Lease as to the portion cancelled shall cease. As to the portion of the acreage not released, the terms and provisions of this Lease shall continue and remain in full force and effect for all purposes.

13. All provisions hereof, express or implied, shall be subject to all Federal and State Laws and the orders, rules, and regulations of all governmental agencies administering the same, and this Lease shall not in any way be terminated wholly or partially, nor shall the Lessee be liable in damages for failure to comply with any of the express or implied provisions hereof if such failure accords with any such laws, orders, rules or regulations. Should the Lessee be prevented during the last year of the primary term hereof from drilling a well hereunder by the order of any constituted authority having jurisdiction, or if Lessee shall be unable during said period to drill a well hereunder due to the equipment necessary in the drilling thereof not being available for any cause, the primary term of this Lease shall continue until one year after said order is suspended or said equipment is available.

14. Lessor hereby warrants and agrees to defend the title to the land herein described and agrees that the Lessee, at its option, may pay or discharge in whole or in part any taxes, encumbrances, or other liens existing, levied or assessed against the above-described lands, and in the event Lessee exercises such option it shall be subrogated to the rights of any holder or holders thereof and may reimburse itself by applying any royalty accruing hereunder to the amount of any such encumbrance, tax or other lien paid by Lessee.

15. Lessee hereby is given the right to acquire for its own benefit, deeds, leases, or assignments covering any interest or claim in leased premises which Lessee or any other party contends is outstanding and not covered hereby and even though such outstanding interest or claim be invalid or adverse to Lessor. In the event the validity of this Lease be disputed by Lessor or by any other person, then, for the period such dispute remain undisposed of, Lessee shall be relieved of all obligations hereunder to explore or develop leased premises; all royalties or other payments which would otherwise accrue shall be suspended for such period; and this Lease automatically shall be extended for an additional period equal to the duration of such period.

16. If at any time within the primary term of this Lease and while the same remains in force and effect, Lessor receives any bona fide offer, acceptable to Lessor, to grant an additional Lease (top lease) covering all or part of the afore-described lands, Lessee shall have the continuing option by meeting any such offer to acquire such top lease. Any offer must be in writing, and must be set forth the proposed Lessee's name, bonus consideration and royalty consideration to be paid for such Lease, and include a copy of the Lease form to be utilized which form should reflect all pertinent and relevant terms and conditions of the top lease. Lessee shall have fifteen (15) days after receipt, from Lessor, of a complete copy of any such offer to advise Lessor in writing of its election into an oil and gas Lease with Lessor on equivalent terms and conditions. If Lessee fails to notify Lessor within the aforesaid fifteen (15) day period of its election to meet any such bona fide offer, Lessor shall have the right to accept said offer.

17. It is specifically understood that each wife and husband named herein and executing this Lease, for the consideration above set out, and the covenants and agreements contained in this Lease to be performed by the Lessee, does hereby release and relinquish unto said Lessee, all right of dower, curtesy and homestead in and to the lands covered hereby for the purpose of this Lease.

18. This Lease and all its terms, conditions and stipulations shall extend to and be binding on all successors in title of said Lessor or Lessee.

19. It is the intent of the Lessor to lease all of Lessor's interest in and to the Section described herein, whether or not the tracts recited hereon are properly described.


IN WITNESS WHEREOF, this Lease is executed as of date first set out hereinabove.

LESSOR

*Robbie Thomas*
Robbie Thomas

*Pamela Thomas*
Pamela Thomas

**ACKNOWLEDGEMENT**

STATE OF ArKAnSAS
COUNTY OF FAwlKner

Before me, the undersigned Notary Public in and for ___FArlkner___ County, ArKanSAS, on this day personally appeared ___Robbie Thomas and Pamela Thomas, husband and wife,___ known to me to be the person(s) whose name (s) is/are subscribed to the foregoing instrument, and acknowledged that he/she/they executed the same as his/her/their free and voluntary act and deed for the purposes and consideration therein expressed, including the relinquishment of curtsey, dower, and homestead.

Given under my hand and seal of office this ___27___ day of September, 2006 .

My Commission Expires:

_____

_____Randy Bean_____
Notary Public

RANDY BEAVERS
NOTARY PUBLIC-STATE OF ARKANSAS
FAULKNER COUNTY
My Commission Expires 9-15-2016
Commission # 12350392

## Exhibit "A"

Attached to and made a part of that certain Oil and Gas Lease dated **September 25, 2006** by and between **Robbie Thomas and Pamela Thomas, husband and wife,** hereinafter referred to as Lessor and Chesapeake Exploration Limited Partnership, as Lessee, covering the following described lands in Faulkner County, Arkansas, to-wit:

### Section 36, Township 8 North, Range 12 West

Part of the SW/4 NW/4 described as beginning at the NE/C of said SW/4 NW/4 and run thence North 87 degrees 45 minutes 41 seconds West along the North line of said SW/4 NW/4 a distance of 200.0 feet; thence South 25 degrees 23 minutes 48 seconds West 327.22 feet or to the centerline of a county road; thence along the centerline of county road South 53 degrees 15 minutes 50 seconds East 100.0 feet; thence South 60 degrees 48 minutes 30 seconds East 137.88 feet to the centerline of Arkansas State Highway #225; thence North 25 degrees 46 minutes 40 seconds East along said centerline of Highway #225 a distance of 320.78 feet to the East line of said SW/4 NW/4; thence North 0 degrees 04 minutes 36 seconds East to the point of beginning, containing **2.07 acres,** more or less.

Being a part of the SW/4 NW/4 described as beginning at the NE/C of said SW/4 NW/4, thence along the North line of said SW/4 NW/4 North 87 degrees 45 minutes 41 seconds West 200.0 feet to the point of beginning; thence South 25 degrees 23 minutes 48 seconds West 327.22 feet or to the centerline of county road; thence along said centerline to a point North 53 degrees 15 minutes 50 seconds West 200.0 feet; thence to a point North 39 degrees 52 minutes 20 seconds West 247.03 feet; thence to a point North 83 degrees 32 minutes 47 seconds West 45.50 feet; thence leaving said centerline North 49.0 feet or to the North line of said SW/4 NW/4; thence along said North line South 87 degrees 45 minutes 41 seconds East 436.61 feet or to the point of beginning, containing **2.0 acres,** more or less.

Part of the SW/4 NW/4 described as beginning at the NW/C of said SW/4 NW/4 run thence South 1264.68 feet; thence East 772.78 feet to the center line of Arkansas State Highway #225; thence North 25 degrees 46 minutes 40 seconds East along said center line 887.37 feet to the intersection of said Highway #225 and the centerline of a county road (Thomas Road); thence along and with said centerline of said county road North 60 degrees 48 minutes 30 seconds West 137.88 feet; thence North 53 degrees 15 minutes 50 seconds West 215.26 feet; thence North 39 degrees 52 minutes 20 seconds West 247.03 feet; thence North 83 degrees 32 minutes 47 seconds West 45.50 feet; thence leaving said centerline of county road North 49.0 feet to the North line of said SW/4 NW/4; thence North 87 degrees 45 minutes 41 seconds West along said North line 662.73 feet to the point of beginning , containing **26.67 acres,** more or less.

**LESS AND EXCEPT** part of the SW/4 NW/4 described as beginning at a point 62.0 feet North of the SW/C of said SW/4 NW/4; thence continue North 166.15 feet; thence South 75 degrees 36 minutes 50 seconds East 668.75 feet; thence West 647.78 feet to the point of beginning, containing **1.23 acres,** more or less.

Containing in the aggregate, **29.51** acres, more or less.

Signed for Identification:

*Robbie Thomas*
Robbie Thomas

*Pamela Thomas*
Pamela Thomas

### Exhibit "B"

Attached to and made a part of that certain Oil and Gas Lease dated <u>September 25, 2006</u> by and between <u>Robbie Thomas and Pamela Thomas, husband and wife,</u> hereinafter referred to as Lessor and <u>Chesapeake Exploration Limited Partnership,</u> as Lessee.

1. Scope of Addendum:
   The terms, agreements, conditions and provisions of the Addendum shall govern the relationship as between the Lessor and the Lessee notwithstanding any contrary provision of the Lease.

2. Limitation on Means of Extraction.
   Extraction of oil or gas from the lands which are the subject matter of the Lease may be accomplished only through a borehole. No strip mining or other extraction method which substantially destroys the surface of the leased lands may be employed.

3. Hydrocarbons.
   For purposes of the Lease, "hydrocarbons" specifically exclude coal, lignite and uranium: <u>provided that the Lease shall include methane gas found in coal formations.</u>

4. Shut-In-Wells:
   Notwithstanding any contrary provision of the Lease, no shut-in well shall be deemed to be a well upon the leased land producing gas in paying quantities for more than **three (3)** consecutive years from the date the well is shut-in. Further, notwithstanding the provisions of the Lease, the annual royalty which shall be paid for a shut-in well shall be equal to $5.00 per net mineral acre for acreage covered by the Lease.

5. Lack of Drilling Equipment.
   This lease cannot be extended for lack of drilling equipment.

6. Marketing Enhancement Clause
   It is agreed between the Lessor and Lessee that, notwithstanding any language herein to the contrary, all oil, gas or other proceeds accruing to the Lessor under this lease or by state law shall be without deduction for the cost of producing, whether directly or indirectly, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder to transform the product into marketable form; however, any such costs which result in enhancing the value of the marketable oil, gas or other products to receive a better price may be deducted from Lessor's share of production so long as they are based on Lessee's actual cost of such enhancements. However, in no event shall Lessor receive a price that is less than, or more than, the price received by Lessee.

Signed for Identification:

_Robbie Thomas_
Robbie Thomas

_Pamela Thomas_
Pamela Thomas

CERTIFICATE OF RECORD
Doc#2006- 23554
10/13/2006
01:45:41 PM
Filed and Recorded in Official Records of
FAULKNER COUNTY
SHARON RZMER
FAULKNER COUNTY CIRCUIT CLERK
by _____ D.C.